# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FIREFIGHTERS' PENSION SYSTEM OF THE CITY OF KANSAS CITY, MISSOURI TRUST, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0466-JTL |
| | ) | |
| FOUNDATION BUILDING MATERIALS, INC., LONE STAR FUND IX (U.S.), LSF9 CYPRESS PARENT 2 LLC, RUBEN D. MENDOZA, CHRIS MEYER, RAFAEL A. COLORADO, CHAD R. LEWIS, CHASE HAGIN, MAUREEN HARRELL, MATTHEW J. ESPE, FAREED A. KHAN, JAMES F. UNDERHILL, AMERICAN SECURITIES LLC, EVERCORE GROUP L.L.C., RBC CAPITAL MARKETS, LLC, and ASP FLAG INTERMEDIATE HOLDINGS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## OPINION ADDRESSING MOTION TO DISMISS UNDER RULE 12(b)(6)

Date Submitted: December 19, 2023
Date Decided: May 31, 2024

Michael Hanrahan, Samuel L. Closic, Jason W. Rigby, Seth T. Ford, PRICKETT, JONES & ELLIOTT, Wilmington, Delaware; Lee D. Rudy, J. Daniel Albert, Kevin M. Kennedy, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Counsel for Plaintiff Firefighters' Pension System of the City of Kansas City, Missouri Trust.*

Daniel A. Mason, Elizabeth Wang, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Andrew G. Gordon, Alexia D. Korberg, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Counsel for Defendant Evercore Group L.L.C.*

Raymond J. DiCamillo, Matthew D. Perri, Kevin M. Kidwell, RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; *Counsel for Defendants Matthew J. Espe, Fareed A. Khan, and James F. Underhill.*

Bradley R. Aronstam, S. Michael Sirkin, Elizabeth M. Taylor, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; John A. Neuwirth, Evert J. Christensen, Jr., Matthew S. Connors, Tania C. Matsuoka, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Counsel for Defendants Foundation Building Materials, Inc., American Securities LLC, and ASP Flag Intermediate Holdings, Inc.*

A. Thompson Bayliss, Daniel G. Paterno, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Barry G. Sher, Kevin P. Broughel, PAUL HASTINGS LLP, New York, New York; *Counsel for Defendant RBC Capital Markets, LLC.*

William B. Chandler III, Brad D. Sorrels, Leah E. León, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; *Counsel for Defendant Ruben D. Mendoza.*

Elena C. Norman, James M. Yoch, Jr., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Brian M. Lutz, George B. Adams III, GIBSON, DUNN & CRUTCHER LLP, San Francisco, California; Colin B. Davis, GIBSON, DUNN & CRUTCHER LLP, Irvine, California; *Counsel for Defendants Chris Meyer, Rafael Colorado, Chad Lewis, Chase Hagin, Maureen Harrell, LSF9 Cypress Parent 2 LLC, and Lone Star Fund IX (U.S.), L.P.*

**LASTER, V.C.**

A private equity fund took one of its portfolio companies public. After the IPO, the fund owned shares carrying a majority of the outstanding voting power, giving it hard control. Before the IPO, the fund and the company entered into a tax receivable agreement. That agreement required the company to pay the fund an amount equal to 90% of the benefit the company obtained from any tax assets generated while the company was privately held.

Changes in federal tax law reduced the value of the payments the fund could expect under the tax receivable agreement. A sale of the company, however, would trigger an early termination payment. That payment would be calculated using favorable valuation assumptions that made it worth more than the present value of the reduced payment stream.

Soon afterward, the fund began to explore its exit options. Not coincidentally, the company's board of directors began exploring a sale. Fund representatives on the board led the sale process.

Well after the sale process was underway, the board created a special committee to address the conflict created by the early termination payment. The board charged the committee with determining whether a sale was advisable and gave the committee the power to say "no." Despite those powers and its charge, the committee was passive. Its members repeatedly went months without convening, including during busy periods when the fund's representatives were negotiating the terms of a sale. The committee also took specific actions that smack of deference to the fund.

The fund directors negotiated a merger that included an early termination payment. The committee recommended the merger to the board, and the board approved it. The fund delivered the stockholder vote by written consent.

The plaintiff sued on behalf of a putative class of minority stockholders. The plaintiff claims that the fund and the directors breached their fiduciary duties by (i) selling the company to secure an early termination payment for the fund, (ii) diverting merger consideration to the fund through the early termination payment, and (iii) employing an unreasonable sale process. The plaintiff also claims that the fund and the directors breached their duty of disclosure. The plaintiff asserts that the two financial advisors and the buyer aided and abetted those breaches of fiduciary duty. The plaintiff also advances claims under the appraisal statute.

Six groups of defendants filed and briefed separate motions to dismiss. This decision is overly long because of all the arguments the defendants raised.

The motions are granted in part and denied in part. The complaint states a claim for breach of fiduciary duty against the fund, the six directors affiliated with the fund, and the CEO. Those defendants faced a conflict of interest for purposes of deciding between continuing to operate the company as an independent entity versus selling the company and triggering the early termination payment. It is reasonably conceivable that those defendants will have to prove that the merger was entirely fair relative to the alternative of having the company remain independent.

The complaint does not state a claim for breach of fiduciary duty against the fund, the fund directors, or the CEO for allegedly using the early termination

2

payment to divert merger consideration from the unaffiliated stockholders. The fund had a contractual right to receive the payment. The fund was entitled to stand on its contract right.

The complaint also does not state a claim for breach of fiduciary duty against the fund, the fund directors, or the CEO for following an unreasonable sale process. Any sale of the company would trigger an early termination payment, so the fund, the fund directors, and the CEO did not face a conflict of interest when pursuing a sale transaction or choosing among sale transactions. They only faced a conflict when deciding between selling the company and having it remain independent. It is possible to quibble with aspects of the sale process, but the fund, the fund directors, and the CEO did not take any steps which, absent a conflict of interest, could cause the process to fall outside the range of reasonableness.

The complaint states claims against all of the director defendants for breach of the duty of disclosure. The complaint fails to state a claim against the fund for breach of the duty of disclosure.

The CEO seeks dismissal on the basis of exculpation. The complaint states a non-exculpated claim against the CEO given his status as a highly paid officer of a controlled company and the conflict that he and the fund faced regarding whether to sell.

The special committee members do not argue that the complaint fails to state a claim against them, only that they are entitled to dismissal on the basis of exculpation. The complaint barely states a non-exculpated claim against the special

3

committee defendants. They did astoundingly little, approved an inherently conflicted compensation arrangement for their financial advisor, and acted as if a sale of the company was a *fait accompli*. The record includes real time indications of excessive deference to the fund. At the pleading stage, it is reasonably conceivable that the committee members consciously disregarded their duties and deferred to what the fund wanted. Exculpation remains a strong defense, and the special committee defendants may be entitled to judgment in their favor at a later stage.

The complaint states claims for aiding and abetting breaches of fiduciary duty against the two financial advisors. Their engagement letters provided for success fees calculated using a formula that included both the merger consideration and the early termination payment. Those arrangements aligned their interests with the fund, rather than with the unaffiliated stockholders. The advisors therefore faced the same conflict of interest as the fund, and the complaint pleads facts supporting an inference that they acted to pursue the fund's interests.

The complaint fails to state a claim for aiding and abetting breaches of fiduciary duty against the buyer. The complaint suggests only that the buyer wanted to acquire the company, understood the fund was insisting on its contractual right to an early termination payment, recognized that the fund had that right, and went forward with the deal.

The complaint states a claim for a violation of the appraisal statute. The company mailed a notice of appraisal rights to stockholders which stated that it was "first" mailed to stockholders "on or about" December 4, 2020. The notice identified

4

December 24 as the deadline for submitting appraisal demands. Under the Delaware General Corporation Law (the "DGCL"), stockholders are entitled to twenty days to demand appraisal. Based on the company's disclosures, it is reasonably conceivable that the notice was mailed too late—at least for some stockholders.

## I.     FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents incorporated by reference.[1] At this stage of the proceedings, the court must accept the complaint's allegations as true and give the plaintiff the benefit of all reasonable inferences.

### A.     The Company

Defendant Foundation Building Materials, Inc. (the "Company") distributes building materials in the United States and Canada. On October 9, 2015, Lone Star[2]

---

[1] Citations in the form "Compl. ¶ ___" refer to the amended complaint, which is the operative pleading. Dkt. 55. The defendants submitted a variety of documents as exhibits in support of their motions to dismiss. Citations in the form "DX ___ at ___" refer to exhibits to the transmittal affidavit of James M. Yoch, Jr., which collects the key documents. Dkt. 68. Because six different groups of defendants filed separate motions to dismiss, the citations "DOB" for "defendants' opening brief" and "DRB" for "defendants' reply brief" are not sufficiently specific. This decision prepends party name abbreviations to those citations and includes the docket number. A citation to the Special Committee Defendants' Opening Brief in Support of Dismissal would thus appear as "SC OB at ___, Dkt. 75." Citations in the form "TRA __" refer to the tax receivable agreement. DX 2. Page references cite to internal pagination whenever possible.

[2] The term "Lone Star" refers both to Lone Star Fund IX (U.S.), L.P. ("Fund IX") and LSF9 Cypress Parent 2 LLC ("Cypress"). Fund IX is the Lone Star fund that acquired and controlled the Company. Cypress is the specific entity that Fund IX used for the investment.

5

acquired the Company in a going-private transaction. Less than eighteen months later, Lone Star took the Company public again.

After the IPO, Lone Star owned shares carrying 65.4% of the Company's outstanding voting power, giving it hard control at the stockholder level. Lone Star also controlled the Company at the board level. Six of the ten members of the Company's board of directors (the "Board") were Lone Star principals or employees. A seventh was the Company's CEO.

## B.    The Tax Agreement

In connection with the IPO, Lone Star and the Company entered into a tax receivable agreement (the "Tax Agreement" or "TRA"). Under the Tax Agreement, Lone Star was entitled to a payment equal to 90% of any benefit the Company received from using a tax asset generated while the Company was privately held. The Company estimated that over fifteen years, it would pay Lone Star between $190 million and $220 million under the Tax Agreement.[3]

Lone Star had the right to terminate the Tax Agreement under specified circumstances. One trigger for Lone Star's termination right was a "Change of

---

With two exceptions, the distinctions between Fund IX and Cypress are not relevant to this opinion, which for simplicity refers to "Lone Star." One exception is the defendants' argument that the plaintiff cannot sue Fund IX without improperly ignoring Cypress's corporate separateness. *See* Part III.A.5, *infra.* The other exception involves the alleged violation of the appraisal statute's notice requirement. *See* Part IV.B., *infra.*

[3] DX 4 at 46.

Control."[4] If Lone Star exercised its termination right, Lone Star gained the right to receive an "Early Termination Payment" equal to "the present value, discounted at the Early Termination Rate as of such date, of all Tax Benefit Payments that would be required to be paid by the Company . . . applying the Valuation Assumptions" and on the assumption that "all Tax Benefit Payments would be paid on the due date (without extensions) for filing the Company's Tax Return with respect to Taxes for each Taxable Year."[5]

The formula for the Early Termination Payment favored Lone Star. Among other things, the Early Termination Rate called for discounting the projected payment stream at "the lesser of (i) 6.50% per annum, compounded annually, and (ii)

---

[4] The Tax Agreement defined a Change of Control as:

- any person or group becoming the beneficial owner of sufficient Company stock to cast more than 50% of the votes eligible to be cast in an election of the Company's directors;

- the Company's stockholders approving a complete liquidation or dissolution of the Company, or the Company sells off all or substantially all of its assets, unless the sale is to an entity that is majority-owned by a majority owner of the Company; or

- a merger or consolidation of the Company if, immediately after the transaction, either (i) the pre-transaction directors did not make up a majority of the surviving company's board or (ii) the pre-transaction stockholders owned 50% or less of the voting stock in the surviving company.

TRA § 1.01.

[5] *Id.* §§ 4.01(d), 4.02(b).

7

LIBOR plus 100 basis points."[6] That is a relatively low discount rate. All else equal, a lower discount rate generates higher present value.

The Valuation Assumptions also favored Lone Star. Among other things, they assumed that the Company would generate taxable income sufficient to fully utilize all of its tax assets, subject to applicable limitations, during the relevant tax year. That meant none of the benefits would be deferred because of insufficient taxable income, which could happen in real life.

## C. The Tax Act

On January 1, 2018, the Tax Cuts and Jobs Act of 2017 (the "Tax Act") took effect. It reduced the federal corporate income tax rate from a maximum rate of 35% to 21%. That in turn reduced the value of corporate tax assets by 40%.[7] Before the Tax Act, a tax asset that would lower corporate income by $1 generated 35 cents of benefit. After the Tax Act, the same $1 generated only 21 cents of benefit.

By reducing the federal rate, the Tax Act reduced the payments Lone Star could expect under the Tax Agreement. To generate the same level of payments for Lone Star, the Company would have to generate more income that could be offset by more tax assets. Before the Tax Act, a $1 reduction in taxable income would generate 35 cents of benefit. After the Tax Act, it would take a $1.67 reduction in taxable income to generate the same 35 cents of benefit. In any given year, the Company

---

[6] *Id.* at §1.01.

[7] (35-21) / 35.

8

might not generate sufficient income to maximize the benefit, or the Company's use of tax assets might be limited by annual caps.

The real-world effect on Lone Star was significant. In its 2017 annual report, the Company reported a $68 million reduction in the anticipated payments under the Tax Agreement.[8] The Company had previously estimated that it would pay Lone Star between $190 million and $220 million under the Tax Agreement. The Tax Act cut those amounts by approximately one third.

Compared to the alternative of receiving payments under the Tax Agreement, the Tax Act made the Early Termination Payment more attractive. The Valuation Assumptions called for assuming that the Company would generate enough income in each taxable year to use the tax benefits to the greatest extent permitted by law, resulting in the maximum possible payment. And the Early Termination Rate called for using a low discount rate to calculate the present value of the payments.

**D.    The Sale Process Begins.**

It is reasonable to infer that after the Tax Act, Lone Star recognized that it could generate more value for itself by selling the Company and triggering an Early Termination Payment than by managing the Company as an independent entity, receiving annual payments under the Tax Agreement, and selling off its position over time. Consistent with that inference, in early 2018, Lone Star began to explore its options for exiting the Company.

---

[8] Foundation Building Materials, Annual Report (Form 10-K) (Dec. 31, 2017) at 48.

9

Chris Meyer was a senior managing director at Lone Star and the Chairman of the Board at the Company. He engaged with Beacon Roofing Supply, Inc. ("Beacon"), a publicly traded roofing products company.[9] Ruben Mendoza, the Company CEO, engaged with American Securities LLC ("American"), a private equity firm.[10]

On May 23, 2018, Beacon sent Meyer a written expression of interest in a transaction at $16.75 per share.[11] The expression of interest did not reference the Tax Agreement or the possibility of an Early Termination Payment.

Meyer convened a special meeting of the Board on May 24, 2018. According to the minutes, Meyer proposed that the Board authorize him to contact "a representative of a major investment bank who is familiar with both the Company and Beacon."[12] The Board agreed. During the meeting, another director affiliated with Lone Star observed that a transaction involving an Early Termination Payment would likely need special "review and authorization procedures . . . in light of the potential conflicts of interest applicable to certain members of the Board that might be found to exist."[13]

---

[9] Compl. ¶ 43–44.

[10] *Id.* ¶ 46.

[11] *Id.* ¶ 47; DX 5.

[12] DX 5.

[13] *Id.*

After the meeting, Meyer contacted Royal Bank of Canada ("RBC"), an investment bank with thick ties to Lone Star. Between January 2016 and June 2019, RBC received $72.7 million in fees from Lone Star and its affiliates, plus another $5.9 million from the Company.

Meyer also contacted Jeffrey Chapman, an attorney with Gibson, Dunn & Crutcher, LLP. Chapman and Lone Star were particularly close. Chapman has described his work for Lone Star as "a career-altering relationship," and Gibson Dunn has acknowledged that "Lone Star has been a real hit for us."[14] Gibson Dunn had advised Lone Star on deals worth billions of dollars, including its $7.6 billion acquisition of Home Properties, Inc. and its $1.4 billion acquisition of Hanson Building Products.

The Company retained Chapman and Gibson Dunn to advise the Board, but Meyer introduced Chapman to RBC in an email as "our partner from Gibson Dun [sic] who has worked extensively with us across our portfolio."[15] When Meyer referred to Chapman as "our partner . . . who has worked extensively with us across or portfolio," he meant Lone Star's partner, not the Company's partner.

After retaining RBC and Gibson Dunn to advise the Company, Meyer called a special meeting for June 4, 2018. Before the meeting, RBC sent its discussion materials and proposed engagement letter to Meyer and another Lone Star-affiliated

[14] Compl. ¶ 50.

[15] *Id.* ¶ 51.

11

director.[16] The engagement letter called for RBC to receive a success fee calculated as a percentage of the consideration received in any deal, but the formula did not include any Early Termination Payment.[17] After Lone Star commented on the draft, the version sent to the Board included the value of any Early Termination Payment in the calculation.[18] That aligned RBC's interests with Lone Star.

During the Board meeting, the directors authorized Meyer to tell Beacon that its expression of interest "was not sufficient to warrant further consideration."[19] But the Board was not terminating the sale process. To the contrary, at RBC's suggestion, the Board instructed management to "prepare a three-year budget and plan to be shared with third parties as may be appropriate in the near future."[20]

During June and July 2018, Meyer engaged with American. On July 24, 2018, American submitted a written expression of interest in a transaction at $18.00 to $19.50 per share. Like Beacon's expression of interest, American's letter did not reference the Tax Agreement or the possibility of an Early Termination Payment.

---

[16] *Id.* ¶¶ 44, 53.

[17] *Id.* ¶ 54.

[18] *Id.*

[19] DX 9.

[20] *Id.*

**E.     The Board Creates The Special Committee.**

Two months later, on September 3, 2018, the Board acted by written consent to form a special committee (the "Special Committee"). It comprised the three members of the ten-member Board who were not affiliated with Lone Star: Matthew J. Espe, Fareed A. Khan, and James F. Underhill. Espe served as Chair.

> The written consent contained recitals that provided the following background:
>
> WHEREAS, seven of the ten members of the Board of the Company are employees of or persons otherwise affiliated with [Lone Star], a majority stockholder of the Company and a party to [the Tax Agreement];
>
> WHEREAS, upon the occurrence of the Change of Control (as defined in the [Tax Agreement]), all obligations of the Company under the [Tax Agreement], including the Company's obligation to make significant payments to Lone Star, may, at the election of Lone Star be accelerated;
>
> . . . .
>
> NOW, THEREFORE, BE IT RESOLVED, that the Board hereby designates the Special Committee . . . .[21]

The Board thus created the Special Committee because of the issues created by the prospect of an Early Termination Payment. At the time, none of the bidders had expressly referenced a payment under the Tax Agreement. The creation of the Special Committee suggests that Lone Star intended to seek a deal that would include one.

In the resolutions creating the Special Committee, the Board committed not to approve any transaction without a prior favorable recommendation from the Special

---

[21] DX 11 at 1–2 (formatting altered).

13

Committee. In other words, the Board gave the Special Committee the power to say "no." The resolutions also empowered the Special Committee to:

- retain its own advisors at the Company's expense;

- investigate possible transactions,

- evaluate the terms of any possible transactions,

- participate in negotiations with relevant third parties regarding any element of a possible transaction,

- participate in negotiations of the terms of any definitive agreement with respect to any possible transactions (the execution of which was subject to Board approval),

- report its recommendations and conclusions to the Board, and

- determine not to pursue any possible transaction.[22]

The resolutions thus gave the Special Committee broad authority over the sale process.

By the time the Special Committee was formed, Meyer and Mendoza had already engaged in significant discussions with Beacon and American, and the Board had received expressions of interest from both bidders. The Board had considered and rejected Beacon's proposal, and American had signed a confidentiality agreement and started diligence. The Special Committee therefore started well behind in the transaction process. Unfortunately, the Special Committee made no real effort to catch up.

---

[22] *Id.* at 2.

14

**F.     The Special Committee Hires Counsel And Decides To Renegotiate RBC's Compensation Structure.**

The Special Committee met for the first time on September 7, 2018. Chapman from Gibson Dunn and Richard J. Tilley, the Company's general counsel, attended. Tilley kept the minutes. The Special Committee discussed the Tax Agreement, "potential outcomes that may occur in the event of the completion of" a transaction, and the need to hire legal counsel.[23]

The Special Committee held its second meeting on September 21, 2018. In the meantime, the Special Committee had hired Richards, Layton & Finger, P.A. ("RLF") as its counsel, and RLF provided an overview of the Special Committee members' fiduciary duties. The Special Committee "determined that, particularly in light of the [Tax Agreement], it was advisable to retain its own independent financial advisor."[24] The Special Committee directed RLF to contact potential candidates.

On October 1, 2018, Beacon submitted a revised expression of interest in a transaction at $17.00 per share, plus a $93 million Early Termination Payment. That was the first offer explicitly referencing the Tax Agreement.

The Special Committee met the next day, but it did not discuss the Beacon offer. Instead, the Special Committee only discussed RLF's role and the possibility of hiring a financial advisor. The Special Committee also reviewed the terms of RBC's engagement letter and discussed "the potential incentives created by the structure of

---

[23] DX 12.

[24] DX 13 at 2.

15

RBC's compensation."[25] The Special Committee "determined that it should attempt to renegotiate this structure so that no payments were dependent on the amounts paid to settle the [Tax Agreement]."[26]

The Special Committee instructed RLF to contact management and Gibson Dunn "to explore the possibility of agreeing to an alternative compensation structure with RBC."[27] It is not clear what happened to that effort, but RBC's compensation structure never changed.

## G. The Special Committee Interviews Financial Advisors, Then Goes Into Hibernation.

The Special Committee held several additional meetings before the end of 2018, but it did not accomplish much. On October 4 and again on October 15, the Special Committee received updates on the deal negotiations that Lone Star and RBC were conducting.[28] On October 17, the Special Committee interviewed two potential financial advisors.[29]

Evercore Group LLC was one candidate. Evercore stressed its "extensive experience in dealing with tax receivables agreements and other similar tax

---

[25] DX 14 at 2.

[26] *Id.*

[27] *Id.*

[28] *See* DX 15 & 16.

[29] DX 17.

16

agreements with sponsors."[30] Evercore also expressed "views on the potential issues faced by the Committee in reviewing the Company's strategic alternatives" and "the importance of the Company's tax receivables agreement in connection therewith."[31]

In its pitch book, Evercore described "The Role and Function of the Special Committee," including:

- "Remain objective and maintain independence."

- "Consider other strategic alternatives including remaining independent."

- "Effectively negotiate on behalf of Foundation Building Materials and the unaffiliated shareholders."

  o "Create negotiating leverage, where possible, and exercise bargaining power."

  o "Make a good faith attempt to negotiate for the best possible price under arm's length terms."[32]

The Special Committee did not heed that advice.

In its presentation, Evercore identified six precedent transactions involving tax receivable agreements. In one transaction, the tax receivable agreement did not provide for an early termination payment, and the agreement remained in place after the transaction. In a second transaction, there was "[n]o early termination consideration paid per transaction negotiation."[33] The other four transactions

---

[30] *Id.* at 2.

[31] *Id.*

[32] DX 18 at 11.

[33] *Id.* at 15.

17

included early termination payments. The presentation listed the amounts but did not state whether they reflected any discount from the full contractual entitlement. The presentation did not provide any other details about the payments, and the meeting minutes do not reflect any discussion of that point.

## H.    Lone Star Considers Taking The Company Private.

Lone Star's interest in a third-party transaction waned in late 2018. The discussions with Beacon and American slowed to a halt. After learning of Lone Star's fading interest, the Special Committee decided not to hire a financial advisor until Lone Star's plans became clearer.[34]

It turned out that Lone Star was thinking about being a buyer rather than a seller, and on March 6, 2019, Meyer informed the Special Committee that Lone Star was interested in acquiring the Company's minority shares.[35]

Meyer asked the Special Committee to waive any conflicts so that Gibson Dunn and RBC could represent Lone Star. The Special Committee met on March 8, 2019, to discuss the request. Tilley, the Company's general counsel, attended the meeting and represented that Gibson Dunn "had not been [the Company's] principal outside counsel for nearly a year."[36] Yet Gibson Dunn's proposed waiver letter disclosed that the firm had been representing the Company since May 2018 in connection with a

---

[34] *See* DX 19 at 2.

[35] Compl. ¶ 71.

[36] *Id.* ¶ 72.

potential sale to a third party and that the firm currently represented the Company in a series of other matters. The disclosure letter also identified a current representation of Lone Star in another matter. Gibson Dunn acknowledged in its waiver letter that it possessed confidential Company information that could be "relevant to its representation of Lone Star."[37] Gibson Dunn nevertheless took the position that its representation of Lone Star in a take-private transaction involving the Company was unrelated to its preceding representation of the Company in a sale process. Gibson Dunn dismissed any conflicts as "theoretical," even though "some of the same attorneys" who had represented the Company would be representing Lone Star and despite acknowledging that when representing multiple clients, the firm "could be tempted to balance the interests between its clients rather than vigorously assert a single client's interests."[38]

The Special Committee did not react negatively when Gibson Dunn and RBC asked to change teams. But as it turned out, the Special Committee did not have to act on the waiver requests. Shortly after the meeting, Meyer notified the Special Committee that Lone Star had decided not to pursue a take-private transaction.

The plaintiff alleges that the waiver request should have been a red flag for the Special Committee. According to the plaintiff, the effort by RBC and Gibson Dunn to switch sides revealed where their true loyalties lay.

---

[37] Compl. ¶ 73.

[38] *Id.*

19

## I.       A Potential Sale Of Lone Star's Shares

In fall 2019, Lone Star engaged with Clayton, Dubilier & Rice ("CD&R"), another private equity firm, about buying Lone Star's shares. CD&R had a significant ownership stake in Beacon, and CD&R was interested in combining the Company with Beacon's interior products division (the "Beacon Combination"). Meyer told CD&R that Lone Star was not interested in a stock-for-stock deal. Lone Star wanted cash.

In September 2019, in the midst of these discussions, Lone Star sold 4.75 million shares in a secondary offering. That reduced Lone Star's aggregate ownership to 52.6%. RBC served as one of three joint bookrunners for the offering.

Lone Star and CD&R continued talking into the next year. The pleading-stage record supports an inference that Gibson Dunn and RBC worked together with Lone Star to pursue a sale of its shares. Lone Star did not inform the Board or the Special Committee about its efforts, nor did Lone Star ask for waivers to work with Gibson Dunn and RBC.

On January 21, 2020, the Board met for thirty minutes. Gibson Dunn attended as "legal counsel to Lone Star."[39] Meyer reported on the Beacon Combination and the potential sale of Lone Star's shares to CD&R. Meyer presented a resolution to expand the Special Committee's mandate to include the Beacon Combination. Like the original written consent establishing the Special Committee, the resolution cited the

---

[39] DX 20.

20

affiliations between Lone Star and a majority of the Board and the potential issues created by the Tax Agreement.[40] The Board approved the resolution.

The Special Committee met immediately after the full Board meeting. It was the first Special Committee meeting in more than ten months. In a brief fifteen-minute meeting, the Special Committee approved a non-disclosure agreement between the Company, Lone Star, and CD&R.

A few days later, Meyer send the Chair of the Special Committee a proposed amendment to RBC's engagement letter to include the Beacon Combination. The Special Committee promptly approved it. That was the last action the Special Committee would take for another seven months.

## J. Apollo Engages And CD&R Bumps.

In February 2020, Meyer spoke with Apollo Global Management, Inc. about acquiring the Company or Lone Star's shares. Neither the Board nor the Special Committee met to discuss Apollo's interest.

On February 13, 2020, CD&R proposed to acquire Lone Star's shares for $17.90 per share. CD&R acknowledged that the transaction would not trigger a Change of Control payment under the Tax Agreement, but its proposal provided for a payment to be made anyway, subject to Special Committee approval. Meyer forwarded the offer to two other Lone Star directors (Lewis and Colorado), commenting: "[P]rice is a non-

---

[40] *Id.* at 1.

21

starter, [Tax Agreement] path is good."[41] Neither the Board nor the Special Committee met to discuss CD&R's proposal.

RBC created a presentation for Lone Star analyzing the returns CD&R could generate. RBC also created other work product for Lone Star and effectively acted as Lone Star's financial advisor. Lone Star never obtained a waiver to work with RBC.

On February 21, 2020, Lone Star made a counteroffer to CD&R. It called for the parties to agree that a sale of Lone Star's shares would trigger an Early Termination Payment under the Tax Agreement.

## K. Discussions Pause, Then Resume.

In March 2020, as the COVID-19 pandemic swept across the United States, Lone Star and CD&R paused their discussions. They resumed in June 2020. Mendoza met with CD&R's CEO, and Lone Star and CD&R exchanged terms.

On July 24, 2020, Mendoza contacted American about re-engaging. The Company's second quarter 2020 results showed it was weathering the COVID-19 pandemic well, and its stock price had risen from $13.73 on July 31, 2020, to $15.54 on August 4, 2020. On August 4, without approval from the Board or the Special Committee, the Company entered into a new confidentiality agreement with American. That same day, Lone Star told CD&R that its price did not warrant further consideration.

---

[41] Compl. ¶ 84.

On August 13, 2020, American said it would re-engage. The next day, Meyer called the Chair of the Special Committee and updated him on recent events.

On August 17, 2020, the Special Committee held its first meeting in over seven months. Two Lone Star directors (Meyer and Colorado) and Gibson Dunn attended. Gibson Dunn had been assisting Lone Star for the past eight months and had appeared at the Board meeting on January 21, 2020, as "legal counsel to Lone Star."[42] Yet Gibson Dunn purportedly attended the Special Committee meeting as "counsel to the Company."[43] Meyer reported that American would make an offer to acquire the Company for $18 per share in cash, "with the amounts payable by the Company in connection with the Tax Receivable Agreement with the Lone Star Funds to be respected."[44] Meyer estimated that the Early Termination Payment would be "approximately $78 million."[45]

Meyer then recommended that the Special Committee retain a financial advisor to assist with potential market checks and render a fairness opinion. Everyone left the meeting except the Special Committee members and RLF.[46] At that

---

[42] DX 20.

[43] DX 22 at 1,

[44] *Id.*

[45] *Id.* at 2.

[46] *Id.*

point, the Special Committee resumed discussing the two financial advisors they had considered over a year-and-a-half before. The Special Committee favored Evercore.

Between August 20 and August 26, 2020, Meyer, Colorado, and Company management revised RBC's engagement letter to remove its obligation to provide a fairness opinion. RBC's percentage-based transaction fee remained the same and still included the Early Termination Payment.

On August 26, 2020, American submitted a formal proposal to acquire the Company for $17 per share, conditioned on thirty days of exclusivity. The proposal did not mention the Tax Agreement. It thus differed significantly from what Meyer had described to the Special Committee.

Two days later, CD&R submitted a proposal to acquire the Company for $18 per share, still contingent on the Beacon combination. The proposal specified that the transaction would trigger acceleration and payment under the Tax Agreement. Meyer forwarded the offer to Mendoza, commenting: "Right things coming together."[47]

## L.   The Board And Special Committee Consider The Proposals.

The Board met later on August 28, 2020. The directors approved RBC's revised engagement letter. Meyer reported on the offers from American and CD&R. The Board instructed RBC to reject American's request for exclusivity and tell both bidders that RBC would follow up with them on their offers.

---

[47] Compl. ¶ 99.

On September 2, 2020, the Special Committee met. According to the minutes, the Special Committee discussed, evaluated, and rejected American's request for exclusivity, yet the Board had already rejected that request five days earlier.[48] According to the minutes, the Special Committee told RLF to tell Gibson Dunn that the Special Committee did not support the already rejected request for exclusivity. It is reasonable to infer that either the Special Committee was out of the loop or that the minutes are wrong.

Notwithstanding the Special Committee mandate, the Special Committee did not envision taking an active role in the sale process. According to the minutes, "[t]he Committee discussed the fact that the Company's investment bank, [RBC], would be taking the lead on behalf of the Company on dealing with potential bidders and advising the full Board of Directors."[49] At the end of the meeting, the Special Committee decided to engage Evercore.

Evercore asked for a fee of $1.5 million to issue a fairness opinion, plus a transaction fee equal to 0.4% of the transaction value and a potential discretionary bonus of $1.5 million. Like RBC, Evercore wanted the transaction value to include both the per-share consideration plus any Early Termination Payment.

The Special Committee had authority to hire its own advisors. Yet RLF forwarded Evercore's proposal to Gibson Dunn, the Company's counsel. Gibson Dunn

---

[48] *Compare* DX 25 at 2, *with* DX 26 at 2.

[49] DX 26 at 3.

then forwarded it to Colorado at Lone Star. Colorado then forwarded it to Meyer, Mendoza, and Tilley. Meyer commented: "This is ridiculous."[50] Gibson Dunn then responded to RLF with comments. No one seemed concerned about two Lone Star-affiliated directors, the Company's CEO, the Company's general counsel, and the Company's outside counsel involving themselves in the Special Committee's hiring of its independent financial advisor.

**M.     American Raises Its Bid.**

On September 4, 2020, American raised its offer to $18 per share and reiterated its request for thirty days of exclusivity. The proposal again did not mention the Tax Agreement.

The Board met on September 8, 2020. The first topic of discussion was the Tax Agreement.[51] Up to that point, the Board had distinguished between proposals that explicitly contemplated a payment under the Tax Agreement and those that did not. At the September 8 meeting, the Board agreed that even American's offer would trigger a full Early Termination Payment.

The Board next discussed the relative merits of the two offers. CD&R proposed a sign-and-consent structure under which Lone Star would approve the transaction by written consent one day after the deal was executed. CD&R's proposal was conditioned on accomplishing the Beacon Combination, but the Board thought that

---

[50] Compl. ¶ 103.

[51] *Id.* ¶ 105.

structure might allow CD&R "to potentially offer a higher price due to synergies."[52] American proposed a two-step merger in which American would buy Lone Star's shares, then tender for the remaining shares. The Board decided that American's structure required "additional diligence."[53]

The Special Committee met on September 10, 2020, ostensibly to review the proposals that the full Board had reviewed two days earlier. Nothing new came out of that discussion. It was the last time the Special Committee would meet for two months.

## N.    Meyer Negotiates A Deal.

Between September 12 and September 23, 2020, Meyer negotiated with CD&R and American, resulting in a series of bids.

- On September 12, 2020, American submitted an updated proposal that explicitly called for a payment under the Tax Agreement.

- On September 14, 2020, CD&R raised its offer to $19 per share, still contingent on the Beacon Combination and still contemplating a payment under the Tax Agreement.

- On September 17, 2020, American withdrew its September 12 offer because it was not granted exclusivity.

- On September 23, 2020, CD&R submitted a revised proposal that added a ticking fee. If CD&R could not close by January 31, 2021, then the purchase price would increase by $0.005 per share per day, starting on February 1, 2021. That equated to $6.5 million per month.

---

[52] DX 27 at 3.

[53] *Id.*

The Special Committee did not meet during that busy period. The full Board met once, on September 16, 2020. At the September 16 meeting, Meyer noted that both proposals now contemplated payments under the Tax Agreement.[54]

The Board next met on September 25, 2020. Meyer reported that because the Company had rejected American's request for exclusivity, American was "no longer in the process."[55] RBC then reported on a "targeted market check" involving five potential buyers.[56] That minimal effort produced four additional interested bidders: Apollo, Bain Capital Private Equity, LP, Blackstone Management Partners L.L.C., and One Rock Capital Partners, LLC. All four had signed confidentiality agreements and started due diligence.[57] Neither the Special Committee nor the Board had been involved.

As Chair of the Special Committee, Espe reported on the status of the Special Committee's work, such as it was. He said that Evercore was working with Tilley, the Company's general counsel, "on due diligence and was continuing to stay updated on potential transactions."[58]

---

[54] DX 30 at 2.

[55] DX 31 at 2.

[56] *Id.*

[57] *Id.*

[58] *Id.*

Two weeks later, on October 8, 2020, the Board met again. RBC reported that One Rock had proposed to acquire the Company for $18 to $19 per share, plus the assignment of the Tax Agreement for no incremental consideration. That was a non-starter for Lone Star. The Special Committee never considered One Rock's offer.

Ten days later, on October 18, 2020, Meyer emailed the Board that CD&R's efforts to complete the Beacon Combination had run into difficulties. The next day, CD&R told Meyer that it wanted to buy the Company regardless. The following day, American sought to reengage. That same day, Apollo submitted a proposal to acquire the Company for a price of $18.50 to $20.50 per share, plus an Early Termination Payment. The Special Committee did not meet to consider these developments.

On October 21, 2020, Meyer, Lewis, and RBC told CD&R, One Rock, and Apollo that there were multiple bidders for the Company. They asked Apollo to confirm that its offer included a "full buyout of the [Tax Agreement]."[59] They asked CD&R to submit a revised proposal before October 28, 2020. No one consulted the Special Committee.

Later that night, RBC reported to Meyer and Lewis that CD&R was "advancing significantly" on the Beacon Combination.[60] The next day, Meyer emailed the Board about recent developments. He reported that all of the participants had been asked to submit updated proposals the following week.

---

[59] Compl. ¶ 122.

[60] *Id.* ¶ 123.

29

The Special Committee was not directly involved in any of these events and did not meet to discuss them. After receiving Meyer's email update, *Espe asked Meyer for permission to share the update with the Special Committee's advisors*.[61] Under the Special Committee's mandate, the Special Committee was ostensibly in charge of the sale process, yet Espe asked Meyer for permission to update Evercore and RLF.

On October 27, 2020, Meyer told American that the Company would grant exclusivity if the purchase price was "sufficiently compelling."[62] American said it was considering a price of $19.25 per share but would not go higher. American also shifted to the same sign-and-consent structure that CD&R had proposed. American continued to contemplate a full payment under the Tax Agreement. Meyer said he would take that offer to the Board.

The Board met later that day. RBC informed the Board that Blackstone and Bain had withdrawn from the process. According to the information statement later sent to stockholders, the Board instructed RBC to tell other potential acquirors to submit best and final offers by October 30, 2020.[63] The minutes, however, do not reflect that instruction.[64] They reflect that RBC had already asked CD&R to submit

---

[61] DX 33 at 1 ("[O]k for me to share with Evercore and Fingers Layton [sic]?").

[62] Compl. ¶ 127.

[63] DX 41 at 24 (cited as IS).

[64] DX 34.

a "new offer letter" by that date, but the instructions and response dates for the other bidders varied.

American submitted an updated proposal on October 28, 2020. The terms tracked its oral proposal from the day before but added a closing condition that would fail if more than 10% of the Company's stockholders exercised their appraisal rights.

One Rock submitted a revised proposal the same day at $18.50 per share. The proposal contemplated a full payment under the Tax Agreement.

On October 29, 2020, the Board met to discuss the sale process. The minutes do not provide any meaningful details, and the information statement does not mention the discussion. At that point, the Special Committee had not met in roughly a month and a half.

The Company had told CD&R to submit a revised proposal by October 30, 2020. CD&R reaffirmed its price of $19 per share, but raised the ticking fee to $0.007 per share per day, resulting in an additional $2.6 million per month. CD&R said that depending on the outcome of its negotiations over the Beacon Combination, it could increase its purchase price above $19 per share. That same day, American submitted a revised offer at $19.25 per share that removed the appraisal condition.

The Board met on October 31, 2020. Meyer dismissed Apollo's range as too wide. Evercore, which had not presented to the Board since its retention, commented on contingencies associated with the CD&R offer. The minutes do not reflect any discussion of the increased ticking fee. Meyer and RBC then presented the revised American offer and the exclusivity agreement.

31

The Board resolved to end the sale process and to proceed with American. Later that day, the Company entered into the exclusivity agreement.

## O.    The Special Committee Gets Back Involved.

Ten days later, on November 10, 2020, the Special Committee met for the first time in two months. The meeting appears scripted to set up the eventual approval of a deal with American.

RLF kicked off the meeting with a recap of the history of the sale process as it had unfolded over the two prior years. Evercore then presented on the financial terms of American's proposal. Evercore also discussed "the impact of the [Tax Agreement] on Evercore's valuation analysis."[65]

In its presentation, Evercore explained that it was "uncertain whether public investors account for tax assets and TRAs in IPOs and how TRA liabilities may impact company valuations." Elaborating, Evercore stated:

- "Because TRAs are disclosed in public SEC documents, one might expect public shareholders to pay less for a company with a TRA than they would for an identical company without a TRA."

- "However, there is limited evidence that public shareholders typically adjust the price they are willing to pay for shares in a public company due to the presence of a TRA."

- "Pre-IPO shareholders generally believe investors tend to ignore tax attributes . . ., [so a TRA] enables the selling shareholder to retain those benefits."

- "Evercore reviewed 30 recent IPOs with TRAs [and] only identified one situation where the TRA liability was regularly treated as a debt-like item by analysts to derive respective price targets."

---

[65] DX 37 at 3.

- "When reviewing Wall Street research of [the Company], we observed that three of the seven equity research analysts explicitly incorporated the company's TRA liability to derive their price targets."[66]

In other words, Evercore believed Lone Star had taken the Company public without paying a discount for the overhang of the Tax Agreement.

Evercore conducted two separate analyses of the Company's value. One assumed that "the [Tax Agreement] had been factored into the Company's stock price."[67] The other assumed that "the [Tax Agreement] had not been factored into the Company's stock price."[68] Evercore combined the analyses when presenting its ranges, such that the high end of the range factored in the effect of the Tax Agreement, while the low end of the range did not.

Evercore wrapped up its presentation by informing the Special Committee that it would be prepared to present a fairness opinion by November 13, 2020. The Special Committee resolved to meet again on November 13 and then adjourned.

Two days later, on the evening of November 12, 2020, Meyer emailed Espe to recommend that the Special Committee decline to pay Evercore its $1.5 million discretionary bonus. Meyer suggested that the bonus go to RBC instead.

Later that night, RLF sent a draft of a Tax Receivable Termination Agreement (the "Termination Agreement") to the Special Committee. The Termination

---

[66] DX 37, Ex. A at 8.

[67] DX 37.

[68] *Id.*

33

Agreement amended the Tax Agreement to confirm its termination in connection with the American transaction. In exchange, the Company agreed to make the Early Termination Payment to Lone Star. The draft RLF sent did not contain the attachment that showed the calculation of the Early Termination Payment.

**P.      Special Committee Approval**

On November 13, 2020, the Special Committee met for the final time to consider a proposed merger agreement between the Company and a subsidiary of American (the "Merger"). Evercore opined that the consideration was fair to the Company's minority stockholders. Evercore reviewed the financial terms of the Merger, including that American would fund 100% of the purchase price and the Early Termination Payment.[69]

The Special Committee adjourned, and its members immediately reconvened in a joint meeting of the Special Committee and the Company's Audit Committee. The joint committee meeting was necessary because the Termination Agreement was a related party transaction between the Company and Lone Star, which required Audit Committee approval. Acting as members of the Audit Committee, the members of the Special Committee unanimously approved the Termination Agreement. The members also reviewed and unanimously approved the draft merger agreement (the "Merger Agreement").[70]

---

[69] DX 38.

[70] *Id.*

At the conclusion of the meeting, the Special Committee resolved to award a $1.5 million discretionary fee to Evercore *and* a $1.5 million bonus to RBC. The members of the Special Committee thus addressed Meyer's desire to give Evercore's bonus to RBC by giving bonuses to both firms.

**Q.      Board Approval.**

On November 14, 2020, the full Board met and approved the Merger Agreement. Immediately after the meeting, Lone Star approved the Merger by written consent.

Later, one of the Lone Star directors (Colorado) circulated a draft of the "Background of the Merger" section for the information statement to be sent to the Company's stockholders (the "Information Statement"). Lone Star, the Company directors, RLF, Evercore, RBC, and Gibson Dunn reviewed it.

Also on November 14, 2020, the Company and Lone Star entered into the Termination Agreement. Unlike the version that the Special Committee approved, the final version included the spreadsheet showing the calculation of the Early Termination Payment. American had received the spreadsheet the day before. Neither the Special Committee nor the Audit Committee ever approved a version of the Termination Agreement with the spreadsheet.

**R.    The Merger Closes.**

The Company mailed out the Information Statement "on or about December 4, 2020."[71] The Information Statement notified stockholders that they had until December 24 to demand appraisal (the "Appraisal Notice").

On December 21, 2020, the Company issued a Form 8-K that substantially revised the Information Statement (the "Supplement").[72] The Company did not mail the Supplement to stockholders. The Company also did not extend the date for filing demands for appraisal.

The Merger closed on January 29, 2020. American acquired the Company using two subsidiaries: ASP Flag Intermediate Holdings, Inc. ("Holdings"), and its wholly owned subsidiary, ASP Flag Merger Sub Inc. ("Merger Sub"). In the Merger, the Company merged with Merger Sub, with the Company as the surviving corporation. The Company emerged from the Merger as a wholly owned subsidiary of Holdings, which in turn was wholly owned by American.

After the Merger closed, Lone Star received an Early Termination Payment of $74.8 million, plus a payment of $8.6 million for tax benefits used through January 29, 2021. The Company made the Early Termination Payment after becoming a wholly owned subsidiary of American.

---

[71] DX 41.

[72] DX 42.

**S.     This Litigation**

The plaintiff sought books and records, then filed this lawsuit. The operative complaint spans 119 pages and contains 280 paragraphs. It names as the "Lone Star Defendants" the six individual directors affiliated with Lone Star (the "Lone Star Directors"), the Company's CEO Mendoza (who also served as a director), and Lone Star itself. It names as the "Special Committee Defendants" the three members of the Special Committee. It also names as defendants: RBC, Evercore, American, Holdings, and the Company.

The operative complaint has six counts. In Count I, the plaintiff asserts violations of the appraisal statute. The plaintiff asserts this count against the Company and Holdings, each of which had obligations under the appraisal statute. Strangely, the plaintiff also asserts Count I against the Lone Star Defendants, the Special Committee Defendants, and American. Count I alleges that (i) the named defendants failed to give stockholders the statutorily required twenty days to demand appraisal, (ii) the Supplement constituted a new appraisal notice that resulted in stockholders only having three days to demand appraisal, and (iii) as a statutory matter, the Appraisal Notice had to contain all information material to the stockholders' appraisal election. As if asserting a claim for breach of the duty of disclosure, Count I asserts six categories of information that the Appraisal Notice allegedly failed to disclose properly.

In Count II, the plaintiff asserts a claim for breach of fiduciary duty against the Lone Star Defendants. The plaintiff alleges that Lone Star and the Lone Star Directors owed the same fiduciary duties, which they violated by engaging in the

Merger. The plaintiff alleges that the Lone Star Defendants must prove that the Merger was entirely fair. The plaintiff also alleges that the Lone Star Defendants breached their duties by timing the Appraisal Notice and the issuance of the Supplement to interfere with the stockholders' ability to assert their appraisal rights.

In Count III, the plaintiff asserts a claim for breach of fiduciary duty against the Special Committee Defendants. The plaintiff alleges that the Special Committee Defendants breached their duties by failing to take an active role in the sale process, relying entirely on Lone Star and on conflicted advisors, and failing to take action to protect the unaffiliated stockholders. The plaintiff also alleges that the Special Committee Defendants breached their duties by timing the Appraisal Notice and the issuance of the Supplement to interfere with the stockholders' ability to assert their appraisal rights.

In Count IV, the plaintiff asserts a claim against Evercore for aiding and abetting the breaches of fiduciary duty by the Special Committee Defendants. The plaintiff contends that Evercore agreed to a compensation arrangement that aligned its interests with Lone Star, then passively went along with the Special Committee Defendants. The plaintiff also asserts that Evercore aided and abetted breaches of the duty of disclosure by the Special Committee Defendants.

In Count V, the plaintiff asserts a claim against RBC for aiding and abetting the breaches of fiduciary duty by the Lone Star Defendants. The plaintiff contends that RBC was hired to serve as the financial advisor for the Company and the Board. Instead, RBC agreed to a compensation arrangement that aligned its interests with

38

Lone Star. The plaintiff also asserts that RBC actually acted as Lone Star's financial advisor.

In Count VI, the plaintiff asserts a claim against American and Holdings (the "Buyer Defendants") for aiding and abetting breaches of duty by the Lone Star Defendants. The plaintiff asserts that the Buyer Defendants participated knowingly in both the breaches of duty related to the Merger itself and in the breaches of the duty of disclosure in connection with the Information Statement and the Supplement.

Six different groups of defendants filed and briefed separate motions to dismiss. The six opening briefs totaled 214 pages. The plaintiff filed a single omnibus answering brief totaling 150 pages. The six reply briefs totaled another 131 pages. In addition to the 495 pages of briefing, the defendants submitted 48 exhibits that added another 1,196 pages. The oral argument on the motion to dismiss lasted almost two hours. This opinion is long because the parties raised so many issues.

## II. THE RULE 12(B)(6) STANDARD AND A ROADMAP

The defendants have moved to dismiss the complaint in its entirety under Rule 12(b)(6). When considering such a motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiff. Dismissal is inappropriate "unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[73]

---

[73] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

Across six counts, the plaintiff asserts five categories of claims. This decision addresses them in the following order.

First, this decision analyzes the contention that the Lone Star Defendants and the Special Committee Defendants breached their duties by (i) pursuing a Change of Control transaction that would trigger the Early Termination Payment rather than operating the Company as an independent entity, (ii) diverting merger consideration from the public stockholders through the Early Termination Payment, and (iii) following an unreasonable sale process (the "Sale Process Claims"). Only the first theory states a claim on which relief can be granted.

Second, this decision analyzes the contention that the Lone Star Defendants and the Special Committee Defendants breached their duty of disclosure (the "Disclosure Claims"). The plaintiff advances its disclosure claim against the same two groups of defendants: the Lone Star Defendants and the Special Committee Defendants. Several disclosure theories state claims on which relief can be granted.

Third, this decision analyzes the claims against other participants in the sale process for aiding and abetting the breaches that are the subject of the Sale Process Claims and the Disclosure Claims (the "Aiding and Abetting Claims"). The claims against RBC and Evercore survive pleading-stage review. The claim against the Buyer Defendants does not.

Last, the decision analyzes the claims related to the appraisal statute (the "Appraisal Claims"). One of the Appraisal Claims survives pleading-stage review.

### III. THE SALE PROCESS CLAIMS

The plaintiff nominally advances the Sale Process Claims against two distinct groups of defendants: the Lone Star Defendants and the Special Committee Defendants. The former category lumps together three different types of sell-side fiduciaries: directors affiliated with a controller (the Lone Star Directors), a CEO who also served as a director (Mendoza), and a controller (Lone Star). The latter category adds another type of sell-side fiduciary: notionally independent directors.

There are potentially significant differences between the duties owed by the different types of fiduciaries. Delaware corporate law is the most developed on the subject of director duties. Our law rests on the statutory foundation that "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors."[74] That grant of authority forms the bedrock for Delaware's board-centric model of governance.[75] The board's possession of nigh-

---

[74] 8 *Del. C.* § 141(a).

[75] *E.g., Quickturn Design Sys., Inc. v. Shapiro (Quickturn II)*, 721 A.2d 1281, 1291–92 (Del. 1998) ("One of the most basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. . . . Section 141(a) . . . confers upon any newly elected board of directors *full* power to manage and direct the business and affairs of a Delaware corporation." (footnotes omitted)); *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 41–42 (Del. 1994) ("The General Corporation Law of the State of Delaware . . . and the decisions of this Court have repeatedly recognized the fundamental principle that the management of the business and affairs of a Delaware corporation is entrusted to its directors, who are the duly elected and authorized representatives of the stockholders."); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 953 (Del. 1985) ("The board has a large reservoir of authority upon which to draw. Its duties and responsibilities proceed from the inherent powers conferred by 8 *Del. C.* § 141(a)."); *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("The bedrock of the

41

plenary authority under Section 141(a) "carries with it certain fundamental fiduciary

obligations to the corporation and its shareholders."[76] Thus, in the standard Delaware

General Corporation Law of the State of Delaware is the rule that the business and affairs of a corporation are managed by and under the direction of its board."); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."). The subsequent history of *Pogostin* and *Aronson* is convoluted. For reasons explained at length elsewhere, this decision omits it. *See, e.g., United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 n.1 (Del. Ch. 2020) (explaining subsequent history), *aff'd sub nom. United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034 (Del. 2021).

[76] *Aronson*, 473 A.2d at 811; *accord N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("The directors of Delaware corporations have 'the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners.' Accordingly, fiduciary duties are imposed upon the directors to regulate their conduct when they perform that function." (footnotes omitted) (quoting *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998)); *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 119 (Del. 2006) ("The legal responsibility to manage the business of the corporation for the benefit of the stockholder owners is conferred on the board of directors by statute. The common law imposes fiduciary duties upon the directors of Delaware corporations to constrain their conduct when discharging that statutory responsibility." (footnotes omitted)); *Malone*, 722 A.2d at 9 (Del. 1998) ("The board of directors has the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners. Accordingly, fiduciary duties are imposed on the directors of Delaware corporations to regulate their conduct when they discharge that function."); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993) ("Our starting point is the fundamental principle of Delaware law that the business and affairs of a corporation are managed by or under the direction of its board of directors. 8 *Del. C.* § 141(a). In exercising these powers, directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders."), *decision modified on reargument on other grounds*, 636 A.2d 956 (Del. 1994); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("It is basic to our law that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. 8 *Del. C.* § 141(a). In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders." (citations omitted)); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986) ("The ultimate responsibility for managing the business and affairs of a corporation falls on its board

formulation, the directors' fiduciary duties run to the corporation and its

stockholders.[77] The standard of fiduciary conduct for directors requires that they

strive to maximize the long-term value of the corporation for the benefit of its firm-

specific stockholders.[78] To fulfill that fiduciary mandate, they must act in good faith,

of directors. 8 *Del. C.* § 141(a). In discharging this function the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders." (footnote omitted)); *see also Quickturn II*, 721 A.2d at 1291 (citing the board's "statutory authority to manage the corporation under 8 *Del. C.* § 141(a) and its concomitant fiduciary duty pursuant to that statutory mandate").

[77] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at \*17 (Del. Ch. Apr. 14, 2017); *accord Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020) ("Directors of Delaware corporations owe duties of care and loyalty to the corporation and its stockholders."); *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010) ("The Company's directors, at the time of the decision to redeem owed fiduciary duties to the corporation and its stockholders."); *Schoon v. Smith*, 953 A.2d 196, 206 (Del. 2008) ("In discharging their management function, directors owe fiduciary duties of care and loyalty to the corporation and its shareholders." (cleaned up)); *Gheewalla*, 930 A.2d at 99 ("It is well established that the directors owe their fiduciary obligations to the corporation and its shareholders."); *Quickturn II*, 721 A.2d at 1292 ("In discharging the statutory mandate of Section 141(a), the directors have a fiduciary duty to the corporation and its shareholders."); *Mills*, 559 A.2d at 1280 ("[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders." (citations omitted)); *Polk v. Good* , 507 A.2d 531, 536 (Del. 1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders."); *see Cede*, 634 A.2d at 367 ("Duty of care and duty of loyalty are the traditional hallmarks of a fiduciary who endeavors to act in the service of a corporation and its stockholders."); *Unocal*, 493 A.2d at 955 (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders").

[78] *See generally McRitchie v. Zuckerberg*, --- A.3d ---, 2024 WL 1874060 (Del. Ch. Apr. 30, 2024); *accord Hsu*, 2017 WL 1437308, at \*19; *In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 39–41; *see*, e.g., *Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009) (holding that "enhancing the corporation's long term share value" is a "distinctively corporate concern[]"); *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 139 (Del. Ch. 2009) ("Ultimately, the discretion granted directors and managers allows them to maximize shareholder value in the long term by taking risks

meaning they must subjectively believe that the course they are following will achieve that end. They must also act free of any conflicts of interest and exercise due care.

Officer duties overlap with director duties. In *Gantler v. Stephens*, the Delaware Supreme Court stated that "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty" and "the fiduciary duties of officers are the same as those of directors."[79] And at a high level, that is true. Officers, like directors, plainly owe duties of loyalty and care. But officer duties are more complicated because their fiduciary status flows from two separate sources. Like directors, they occupy formal roles within the corporate governance structure that the DGCL recognizes, and like directors, they can cause the corporation to exercise corporate power on behalf of the corporation and its stockholders.[80] At the same time,

---

without the debilitating fear that they will be held personally liable if the company experiences losses."); *TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *7 (Del. Ch. Mar. 2, 1989) (describing as "non-controversial" the proposition that "the interests of the shareholders as a class are seen as congruent with those of the corporation in the long run" and explaining that "[t]hus, broadly, directors may be said to owe a duty to shareholders as a class to manage the corporation within the law, with due care and in a way intended to maximize the long run interests of shareholders"). *See generally* Zachary J. Gubler, *The Neoclassical View of Corporate Fiduciary Duty Law*, 91 U. Chi. L. Rev. 165, 198–224 (2024) (explaining that the perpetual entity model—uniquely among theories of the corporation—fits the observable statutory features and common law rules, correctly conceives of the corporation as an entity, and explains the orientation of director duties); William T. Allen, *Ambiguity in Corporation Law*, 22 Del. J. Corp. L. 894, 896–97 (1997) ("[I]t can be seen that the proper orientation of corporation law is the protection of long-term value of capital committed indefinitely to the firm.").

[79] *Gantler*, 965 A.2d at 708–09.

[80] *See 8 Del. C.* § 142.

officers are corporate agents and, as agents, owe duties that the directors don't. Those duties include a duty of obedience requiring compliance with directives from the principal or from more senior agents.[81] When the board has made a decision, the duty of obedience may require compliance with that decision, even if the officer might independently have followed a different course.[82]

A similar picture of broad alignment plus particularized divergence exists for director duties and controller duties. Historically, Delaware cases equated the two.[83] Yet controllers owe fiduciary duties in at least two different settings. One is when the controller exercises general or transaction-specific control over the board, takes over the corporate machinery, and effectively substitutes its wishes for those of the

[81] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 842–45 (Del. Ch. 2022). *See generally* Restatement (Third) of Agency § 8.09 (Am. L. Inst. 2006), Westlaw (database updated June 2024).

[82] *See Cygnus Opportunity Fund, LLC v. Washington Prime Gp., LLC*, 302 A.3d 430, 448–53 (Del. Ch. 2023) (discussing implications of duty of obedience in the context of the duty of disclosure). Officer duties can also diverge from director duties for purposes of the duty of oversight. *See In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 369–75 (Del. Ch. 2023).

[83] *See Singer v. Magnavox Co.*, 380 A.2d 969, 976–77 (Del. 1977) ("It is settled Delaware law, for example, that corporate officers and directors and controlling shareholders owe their corporation and its minority shareholders a fiduciary obligation of honesty, loyalty, good faith and fairness." (citations omitted)), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) (rejecting business purpose test); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–10 (Del. 1952) ("Plaintiffs invoke the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property. Since they stand on both sides of the transaction, they bear the burden of establishing its entire fairness, and it must pass the test of careful scrutiny by the courts." (citations omitted)).

directors. In that setting, the controller owes the same duties that the directors would owe. But in other settings, the same duties do not apply. For example, when a controller negotiates an interested transaction opposite a majority independent board or an independent committee, the controller does not owe a duty of care. The controller also does not have a duty to ensure that the transaction is the best alternative available for the controlled corporation and its stockholders. The directors owe those obligations. The controller only has an obligation of non-harm, manifested in the requirement to ensure that the stockholders receive the substantial equivalent of what they had before.[84] And when a controller exercises other rights it holds, the stockholder controller only owes a duty not to harm the corporation or its minority stockholders knowingly or through grossly negligent conduct.[85]

Happily, the parties gloss over these nuances, taking the position that Lone Star, the directors, and Mendoza owed the same duties and breached them in the same way. For purposes of the Sale Process Claims, the defendants do not take issue with that framing. The only divergence arises because Mendoza and the Special Committee Defendants invoke an exculpation defense.

## A.    The Sale Process Claims Against The Lone Star Defendants

Whether the plaintiff has stated Sale Process Claims against the Lone Star Defendants depends on whether the complaint alleges facts supporting a reasonably

---

[84] *See In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 521 (Del. Ch. 2024).

[85] *Id.* at 512.

46

conceivable claim of fiduciary breach. Evaluating that issue requires determining the applicable standard of review, then using it to evaluate the allegations in the complaint. One theory supports a viable claim.

### 1. Determining The Standard Of Review

The standard of review is the test that a court uses to determine whether a corporate fiduciary has breached its duties. Entity law generally deploys three standards of review: a default standard that is highly deferential to the fiduciary, an intermediate standard under which the fiduciary must show that its actions were reasonable, and an onerous standard under which the fiduciary must show that its actions neither harmed the beneficiary nor conferred any undeserved benefit on the fiduciary.[86]

Delaware's default standard of review is the business judgment rule.[87] The business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[88] Unless one of the elements is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the

---

[86] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457–59 (Del. Ch. 2011).

[87] *Trados II,* 73 A.3d at 43.

[88] *Aronson*, 473 A.2d at 812.

47

corporation's objectives."[89] "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty."[90]

Delaware's intermediate standard of review is enhanced scrutiny.[91] Delaware courts deploy enhanced scrutiny in specific, recurring situations marked by two features. First, there is an identifiable decision-making context where the realities of the situation can subtly undermine the decisions of even an independent and disinterested fiduciary.[92] "Inherent in these situations are subtle structural and situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference," under the business judgment rule.[93] Second, the decision under review involves the fiduciary

---

[89] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

[90] *Trados II,* 73 A.3d at 43; *see also Brehm,* 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co., Inc. S'holders Litig.,* 542 A.2d 770, 780–81 (Del. Ch. 1988) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

[91] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 249 (Del. Ch. 2021).

[92] *Trados II*, 73 A.3d at 43–44.

[93] *In re Rural Metro Corp. S'holder Litig.*, 88 A.3d 54, 82 (Del. Ch. 2014), *aff'd sub nom. RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

intruding into a space where stockholders possess rights of their own.[94] The fiduciary's exercise of corporate power therefore raises questions about the allocation of authority within the entity and, from a theoretical perspective, implicates what economists refer to as the principal-agent problem. The resulting situation calls for an intermediate standard of review that examines "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end."[95] Operationally, enhanced scrutiny puts the burden on the fiduciaries to establish that they (i) acted for a proper purpose and (ii) selected an appropriate means of achieving that purpose.[96]

Delaware's most onerous standard is the entire fairness test.[97] It applies when the corporate fiduciary labors under an actual conflict of interest.[98] Entire fairness is a unitary standard that has both substantive and procedural dimensions. Although the two aspects may be examined separately, they are not separate elements of a two-part test. "All aspects of the issue must be examined as a whole since the question is one of entire fairness."[99]

---

[94] *See In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 458–59 (Del. Ch. 2023)

[95] *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016).

[96] *Columbia*, 299 A.3d at 459.

[97] *Presidio*, 251 A.3d at 249.

[98] *Id.*

[99] *Weinberger*, 457 A.2d at 711.

The substantive dimension of the fairness inquiry examines the transactional outcome. The cases that developed the entire fairness test historically involved freeze-outs or squeeze-outs.[100] The substantive fairness of the transaction therefore largely turned on the price that the minority stockholders received, and "fair price" became the dominant nomenclature for the substantive dimension. In that setting, the fair price inquiry generally involved comparing what the stockholders received with their proportionate share of the corporation's value as a going concern. Thus, in the canonical framing, fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[101] But the substantive dimension of the entire fairness inquiry has never been narrowly focused on evaluating a price. The true "test of fairness" is whether the minority stockholder receives at least "the substantial equivalent in value of what he had before."[102]

---

[100] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1033–35 (Del. Ch. 2020) (describing history of asset sales and mergers).

[101] *Weinberger*, 457 A.2d at 711.

[102] *Sterling.*, 93 A.2d at 114; *accord Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) ("[T]he correct test of fairness is 'that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before.'" (quoting *Sterling*, 93 A.2d at 114)); *see* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 139 (2005) (arguing for a remedial standard that "provides the minority shareholders with the value of what was taken from them . . . .").

The procedural dimension of the entire fairness inquiry examines the process that generated the result. Known as "fair dealing," it "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[103] The procedural dimension "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[104]

The procedural dimension matters because the substantive dimension is often contestable. "The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness objective."[105] Instead, a judgment concerning fairness "will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case."[106] Thus, if fiduciaries successfully replicate arm's length bargaining, then that evidence of fair dealing can validate a debatable outcome. But the opposite is also true: a dubious process can call into question a low

---

[103] *Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422, 430 (Del. 1997).

[104] *Weinberger*, 457 A.2d at 711.

[105] *Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452, at *8 (Del. Ch. Mar. 21, 1996) (Allen, C.), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

[106] *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary III)*, 663 A.2d 1134, 1140 (Del. Ch. 1994) (Allen, C.), *aff'd, (Technicolor Plenary IV)*, 663 A.2d 1156 (Del. 1995).

but nominally fair price.[107] "Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved."[108] When those factors are present, a court

---

[107] *See Tremont II*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *37 (Del. Ch. July 6, 2018) ("Just as a fair process can support the price, an unfair process can taint the price."), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1183 (Del. Ch. Nov. 4, 1999) ("[T]he unfairness of the process also infects the fairness of the price."), *aff'd per curium*, 776 A.2d 437 (Del. 2000).

[108] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *19 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291 (Del. 2018) (TABLE).

may conclude that the transaction is not entirely fair. As a remedy, the court could award a "fairer price"[109] or rescissory damages.[110]

To determine whether the complaint pleads a claim for breach, a court must determine what standard of review applies, then evaluate the complaint's allegations using that standard of review. If the business judgment rule applies, then the court will not second guess the fiduciary's decision, and the claim will be dismissed. If enhanced scrutiny applies, then the court must determine whether the complaint sufficiently pleads facts supporting an inference that the defendants could not satisfy the enhanced scrutiny standard of review. "The possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to

---

[109] *Id.*; *accord Reis*, 28 A.3d at 467 ("Depending on the facts and the nature of the loyalty breach, the answer can be a 'fairer' price."); *see, e.g., In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *2 (finding that controller and his associate had engaged in fraud; holding that "[u]nder these circumstances, assuming for the sake of argument that the $13.50 price still fell within a range of fairness, the stockholders are not limited to a fair price. They are entitled to a fairer price designed to eliminate the ability of the defendants to profit from their breaches of the duty of loyalty."); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 116–17 (Del. Ch. 1999) (finding that although price fell within lower range of fairness, "[t]he defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *Bomarko,*, 794 A.2d at 1184–85 (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts).

[110] *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023–24 (Del. 2001); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501–03 (Del. 1981), *overruled on other grounds by Weinberger*, 457 A.2d at 703–04.

dismiss under Rule 12(b)(6) unless the alleged controlling stockholder is able to show, conclusively, that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it."[111]

## 2. The Claim Based On The Decision To Pursue A Change Of Control Transaction

The plaintiff alleges that the Lone Star Defendants faced a conflict of interest and acted disloyally when pursuing and approving the Merger. The plaintiff contends that entire fairness applies to that decision. That theory supports a claim on which relief can be granted.

Entire fairness applies at the pleading stage when it is reasonably conceivable that a controller has a conflict of interest that causes its interests to diverge from those of the stockholders as a whole. Entire fairness also applies at the pleading stage when the challenged decision was not made by directors comprising an independent and disinterested majority of the board. The decision to pursue and approve the Merger presents a straightforward scenario that satisfies both triggers.

---

[111] *Klein v. H.I.G. Cap., LLC*, 2018 WL 6719717, at *16 (Del. Ch. Dec. 19, 2018) (internal quotation marks omitted) (quoting *Hamilton P'rs L.P. v. Highland Cap. Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014)); *accord Salladay v. Lev*, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020) (explaining that when entire fairness is the standard of review, and when a plaintiff alleges facts making it reasonably conceivable that the transaction was not entirely fair to stockholders, "the granting of a motion to dismiss is inappropriate, because the burden is on the defendants to develop facts demonstrating entire fairness").

A fiduciary is interested in a transaction when the fiduciary receives a form of consideration not shared pro rata with the stockholders.[112] Through the Merger, Lone Star received two separate forms of consideration. First, Lone Star received an amount per share, just as the other stockholders did. Second, Lone Star received the Early Termination Payment. Only Lone Star received the Early Termination Payment, meaning that Lone Star received a non-ratable benefit. Entire fairness applies.

The Lone Star Directors also faced a conflict. Six of them were affiliated with Lone Star, and the seventh was the CEO of a company Lone Star controlled. Entire fairness applies for the additional reason that the Board lacked a majority of disinterested and independent directors.

The nature of the Early Termination Payment meant that the Lone Star Defendants faced a conflict of interest when making certain decisions but not others. The Company had paths available that would *not* have given Lone Star the right to claim an Early Termination Payment. Most notably, the Company could have continued to operate as an independent entity and paid Lone Star lower amounts over time. When choosing between that path and a transaction that would trigger the

---

[112] *In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 176 (Del. Ch. 2005) ("A well settled precept of Delaware corporate law is that a fiduciary is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."); *Palkon v. Maffei*, 311 A.3d 255, 273 (Del. Ch. 2024) ("A fiduciary is interested in a transaction when it confers a material benefit on the fiduciary."); *Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.").

Early Termination Payment, the Lone Star Defendants faced a conflict. By contrast, if Lone Star was choosing between two Change of Control transactions, all of which would trigger the right to an Early Termination Payment, then the Lone Star Defendants would not face a conflict of interest *as between those transactions*.

The allegations of the complaint support a reasonably conceivable inference that the Lone Star Defendants acted self-interestedly by initiating a sale process to secure both consideration for its shares and the Early Termination Payment, then approving the Merger to secure both forms of consideration.[113] The complaint supports a reasonably conceivable inference that the Lone Star Defendants only began pursuing a sale of the Company after the Tax Act reduced the stream of contractual payments Lone Star could expect to receive. The complaint's allegations support a reasonably conceivable inference that for the Company and its minority stockholders, continuing to operate the firm as an independent entity and paying lesser amounts to Lone Star represented the value-maximizing option. In other words, it is reasonable to infer that faithful fiduciaries would not have sold the Company at all. The Lone Star Defendants, however, initiated a sale process with the goal of securing the Early Termination Payment, which was inferably more

---

[113] *See* Compl. ¶¶ 41, 43, 153–55; PAB at 76 ("[I]t was the Lone Star Defendants who began efforts in early 2018 to exit Lone Star's FBM stake and accelerate payments under the TRA after the value and certainty of TRA payments was greatly reduced."); *id.* at 8q ("Lone Star, as FBM's controlling stockholder, instigated the sale process in early-2018 and controlled its timing to benefit Lone Star."); Tr. 75–76 (plaintiff's counsel confirming that they challenged the decision to sell the Company as a breach of fiduciary duty).

56

advantageous to Lone Star. During the sale process, the Lone Star Defendants were fixated on the Early Termination Payment and both sought out and approved a deal that would deliver it.

Under this theory, Lone Star must prove that the Merger was entirely fair relative to the alternative of operating the Company as a standalone entity. That theory states a claim on which relief can be granted.

### 3. The Claim Based On The Alleged Diversion Of Merger Consideration

The plaintiff also contends that the Lone Star Defendants must prove that the Merger was entirely fair because the Lone Star Defendants diverted consideration to Lone Star through the Early Termination Payment. That theory neither triggers entire fairness review nor states a claim on which relief can be granted. Once Lone Star made the decision to approve the Merger, Lone Star had a contractual entitlement to the Early Termination Payment. The Company's stockholders did not have any entitlement to a proportionate share of the proceeds generated by the Merger free from Lone Star's contractual right. The Lone Star Defendants therefore do not have to defend the fairness of the Merger relative to a hypothetical merger in which all of the consideration went to the Company's stockholders *pro rata* with no consideration attributed to the Early Termination Payment.

The plaintiff frames its attack on the Early Termination Payment as involving the diversion of merger consideration. As dealmakers know, there are numerous channels in every deal through which value can pass from a buyer to a seller. The topline consideration per share is only the most visible method. Other examples

57

include non-competition and non-solicitation agreements, consulting agreements, employment agreements, and agreements governing intellectual property. Each type of agreement has a legitimate use. A buyer may want to ensure that a seller does not compete with the acquired business for a period of years, or a buyer may want to secure the continued services of the sell-side principal. Each type of agreement can legitimately warrant compensation, because the sell-side counterparty is taking on additional obligations. But those agreements can also be used as vehicles for reallocating consideration in disproportionate ways. This is a familiar aspect of corporate law, ably illustrated by the well-known reality that takeover defenses can be used legitimately to defend against an undervalued bid or illegitimately for purposes of entrenchment. It is also true of life generally: Virtually every technology that humans have produced can be used for good or ill. The same is true for side-agreements, which is why facts matter.

### a. The *Martha Stewart* Case

Recognizing that side deals can be legitimate or illegitimate, this court has rejected bight-line rules under which side-payments either always support an inference of unfairness or never do.[114] In *Martha Stewart*, this court framed the challenge as one of distinguishing between "an *improper* diversion" of consideration

---

[114] *See, e.g.*, *Golaine v. Edwards*, 1999 WL 1271882, at \*6 (Del. Ch. Dec. 21, 1999) (conducting a fact-specific analysis to determine whether a side-payment diverted merger consideration and rendered a transaction underpriced; noting that "[t]he analysis of whether [] side transactions tainted the fairness of the transaction to the target stockholders becomes in large measure a judgment about whether it was appropriate or not for those side transactions to occur").

and a legitimate diversion of consideration.[115] That framing recognizes that a buyer typically has business goals to achieve and a limited amount of consideration to achieve them. Although the different constituencies and components of a deal may well compete for consideration, some allocations are both necessary and appropriate. A deal may not happen unless the buyer meets the legitimate demands of a sell-side fiduciary who can demand consideration for accepting additional contractual obligations.

Both sides have relied on the *Martha Stewart* decision. There, a third-party buyer acquired Martha Stewart Living Omnimedia, Inc. in a transaction that featured side agreements with Martha Stewart, Omnimedia's controller. The court held that the defendants properly deployed the two-step *MFW* process, resulting in a business judgment rule dismissal. But the court also held that entire fairness was not the proper standard of review in the first place because Stewart had not improperly diverted consideration from the minority stockholders.

The key to understanding the *Martha Stewart* decision is the plaintiff's failure to plead any reasonably conceivable benefit for Stewart compared to potential alternatives, including continuing to operate the company as a standalone entity. Before the transaction, Stewart and Omnimedia were parties to three agreements. One was Stewart's employment agreement as CEO. The other two were license agreements under which Omnimedia paid Stewart for the use of her name and other

---

[115] *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *13 (Del. Ch. Aug. 18, 2017).

intellectual property. A buyer approached the company, initially offering $6.15 per share. After due diligence, the buyer dropped its offer to $5.75 per share. The buyer then asked to negotiate with Stewart over terms on which she would continue with the company, recognizing that without Stewart's approval, the deal would not proceed. A special committee authorized those discussions.

Subject to the special committee's approval, Stewart and the buyer agreed to license agreements that were substantially identical to the existing agreements between Stewart and Omnimedia, albeit with extended terms. Those deals effectively maintained the status quo and did not represent a diversion of consideration. Stewart also secured a registration rights agreement to ensure that she could sell an agreed upon number of the shares she received in the transaction, which contemplated that all of the sell-side stockholders would receive half of the consideration in stock. Although the opinion did not dilate on this point, the existence of that agreement suggests that while the minority stockholders received freely tradable shares, Stewart agreed to restrictions on at least some of her shares. That suggests that Stewart accepted a detriment relative to the minority stockholders and that the registration rights agreement partially mitigated that detriment. That was not a diversion of consideration either.

The court then turned to the new employment agreement. As initially described, the new agreement seems to have provided Stewart with somewhat

increased employment benefits.[116] Later in the decision, however, the court held that the plaintiffs "failed to distinguish the 'new' side deals from the 'old' side deals in any meaningful way," indicating that the new employment agreement was not materially better.[117] No consideration flowed to Stewart there.

That left only a final arrangement under which the buyer agreed to pay Stewart $4 million as reimbursement for transaction expenses. The court noted that because Stewart owned half of Omnimedia's equity, eliminating that payment and distributing the consideration across all of the stockholders pro rata would have resulted in an additional $2 million going to Stewart. On net, therefore, Stewart at most received a side payment of $2 million. The court declined to infer that a $2 million side payment, representing 0.5% of the merger consideration, could inferably render the transaction unfair.[118]

On the facts of *Martha Stewart*, that conclusion makes sense. A net expense reimbursement of $2 million does not seem facially excessive in absolute terms. Meanwhile, litigating an entire fairness case to judgment over a potential $2 million recovery would be economically irrational for the defendants and likely for the

---

[116] *Id.*, 2017 WL 356089, at *9.

[117] *Id.* at *12.

[118] The plaintiffs alleged that the $4 million payment equated to $0.07 per share, implying that a $2 million net payment equated to $0.035 per share. As a percentage of the deal consideration of $6.15 per share, that equates to 0.5%.

plaintiff as well. The case thus smacked of socially unwholesome litigation. One might have called it a strike suit.[119]

The *Martha Stewart* decision also cited other factors that offer less meaningful guidance at the pleading stage. First, the *Martha Stewart* decision noted that the buyer raised its bid after negotiating with Stewart and treated that as an indication that the negotiations had not diverted merger consideration.[120] But that is an ambiguous signal, because a buyer can easily choreograph its approach to fit that pattern. Assume a buyer is willing to pay up to $1 billion for a company, anticipates that the controller will seek to extract a package of side agreements valued at $50 million, and wants to be able to increase its bid by up to 10% during the negotiations to make the sell-side negotiators feel good about the deal and fit within the *Martha Stewart* paradigm. If the buyer opens at $850 million, the buyer can negotiate a package of side agreements with the controller worth the targeted $50 million, then increase its bid from $850 million to $935 million. The total deal consideration would be $985 million ($935 million for stockholders plus $50 million for the side agreements), still below the reserve value of $1 billion. Any moderately sophisticated buyer will understand that a seller will not want to go backward on price, so even

_____

[119] The value of the allegedly improper diversion both in absolute and relative terms supported that conclusion. In a larger deal, a similar percentage of allegedly diverted proceeds might be more significant, potentially warranting a lawsuit to combat skimming. *See New Enter. Assocs. 14, L.P. v. Rich (NEA)*, 292 A.3d 112, 164–65 (Del. Ch. 2023); *Harris v. Harris*, 2023 WL 115541, at *12 & n.6 (Del. Ch. Jan. 6, 2023).

[120] *Martha Stewart*, 2017 WL 356089, at *12.

without the *Martha Stewart* precedent, a buyer would likely strive for that pattern. In a post-trial decision, a court could consider the overall dynamics of the negotiation and take the back and forth on price into account when assessing whether a controller extracted value. At the pleading stage, whether a seller increases its price after negotiating the side agreements is not a meaningful indicator.

Second, the *Martha Stewart* decision noted that the buyer proposed the side agreements, rather than Stewart demanding them.[121] Buyers can choreograph that too, and a sophisticated buyer who sees that an insider has existing agreements will naturally seek to address them. To the extent that side-payments become standard features of transactions, buyers would offer them as a matter of course. Here too, a court might consider who offered what as part of a post-trial analysis. At the pleading stage, who made the offer provides an ambiguous signal, so the plaintiff gets the benefit of the doubt.

Third, the *Martha Stewart* decision acknowledged the legitimacy of Stewart asking for her side deals, stating:

> [The buyer] was acquiring the Martha Stewart brand and, in part, the continued commitment of Martha Stewart's time, energy and talent to keep the brand alive and thriving. It was entirely proper for [the buyer] to pay, and for Stewart to accept, extra consideration (just as [Omnimedia] had paid before the Merger) to secure the immeasurable value of that commitment.[122]

---

[121] *Id.*

[122] *Id.* at *13.

That is true, but it does not address the *amount* of consideration that Stewart extracted. Stewart had the right to seek and accept extra consideration, just as a majority controller has the right to use a merger to squeeze out the minority shares. For the majority controller, fairness principally turns on how much the minority received. The same was true for Stewart. Focusing on Stewart's right to demand side payments overlooks their magnitude, which was the key issue.

Fourth, the *Martha Stewart* decision questioned whether Stewart had any incentive to divert consideration to herself through side deals given that "she herself was a stockholder who had by far the largest stake in the Merger consideration."[123] True, but Stewart's 50% ownership meant she received fifty cents of any dollar that went to the stockholders as a whole, but one hundred cents of any dollar that went to her through a side payment. Stewart's large stockholdings gave her an incentive to police side deals involving payments to others (because she would foot half the bill), but it did not mitigate her incentive to favor side payments for herself.

These secondary points do not undermine the outcome in *Martha Stewart* or its core rationale. The pleading-stage dismissal ultimately resulted from the court's conclusion that Stewart's deals with the acquiror tracked "to reasonable degrees . . . the structure, value and obligations of the side deals she had in place before the Merger."[124] They thus maintained the status quo and did not divert consideration.

---

[123] *Id.*

[124] *Id.*

### b. The Facts Of This Case

Compared to *Martha Stewart*, this is a much easier case. In *Martha Stewart*, the controller negotiated new agreements. The court therefore had to assess whether it was reasonably conceivable that the new agreements reflected improved terms for the controller. This case does not require a before-and-after comparison. The Tax Agreement was an existing agreement, put in place before the Company's IPO and part of its operative reality. No one disputes that the Tax Agreement called for the Early Termination Payment. The complaint does not allege that Lone Star received more than what the contract called for.

Instead, the plaintiff seeks to distinguish *Martha Stewart* on its facts. The plaintiff observes that unlike the acquirer in *Martha Stewart*, who wanted Stewart to play a role with Omnimedia going forward, American did not need Lone Star's good will to support the Company after the Merger. The plaintiff also observes that Lone Star demanded the Early Termination Payment, rather than American offering it. Those distinctions fixate on secondary aspects of the *Martha Stewart* decision. They represent the flipside of the argument that defense lawyers now routinely make, in which they maintain that an entire fairness claim cannot arise as long as (i) the buyer proposed a side deal in the first instance and (ii) the seller negotiated the bidder up from its initial offer. Both are overly reductive readings of *Martha Stewart*. Here, as in *Martha Stewart*, there was no material change between what Lone Star received and what Lone Star was entitled to receive under its pre-existing contract.

The plaintiff next argues that Lone Star could not insist on the full measure of its existing contractual rights under the Tax Agreement, because the Early

Termination Payment "was a negotiating point."[125] The plaintiff observes that Evercore identified a deal in which a seller waived its right to a payment under a tax receivable agreement and stresses that some of the bidders made offers that did not initially or explicitly contemplate a payout.

The fiduciary calculus does not turn on what others might have asked for, but what duties the Lone Star Defendants owed. Delaware law does not require that a fiduciary engage in altruism. Chancellor Allen rejected a similar argument when considering whether a stockholder controller that had lent money to the controlled corporation could exercise its creditor rights against the firm:

> [F]iduciary obligation does not require self-sacrifice. More particularly, it does not necessarily impress its special limitation on legal powers held by one otherwise under a fiduciary duty, when such collateral legal powers do not derive from the circumstances or conditions giving rise to the fiduciary obligation in the first instance. Thus one who may be both a creditor and a fiduciary (*e.g.*, a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights.[126]

That bright-line assertion represents something of an overstatement, because there are settings in which a controller's exercise of contract rights could give rise to a fiduciary breach,[127] but such a scenario requires meaningfully more than a fiduciary's insistence on being paid an amount due to them. The general proposition holds.

---

[125] PAB 86.

[126] *See, e.g.*, *Odyssey P'rs, L.P., Odyssey-ABC Ltd. P'ship*, 1996 WL 422377, at *3 (Del. Ch. July 24, 1996) (Allen, C.) (citation omitted).

[127] For example, this court has held a stockholder controller liable for using its contractual rights to maneuver the controlled company "into a position of maximum

Here, Lone Star was entitled to stand on the terms of the Tax Agreement. That agreement was a commercial contract that contained provisions designed to compensate Lone Star for the Company's use of tax assets created while Lone Star was the sole owner of the Company. The agreement provided for the Early Termination Payment. Just as a controller who loaned money to the controlled corporation could insist on full payment following an event of default, Lone Star could similarly insist on the Company fulfilling its contractual obligations.

Taking a different approach, the plaintiff suggests that the Early Termination Payment is suspect because Lone Star entered into the Tax Agreement with the Company before its IPO, when Lone Star could simply impose the arrangement. A stockholder can challenge the enforceability of an agreement if the fiduciary breached its duties when entering into it.[128] But the plaintiff has not asserted that claim.

---

financial distress where it had no options" other than to accept the controller's preferred method of financing. *See Basho*, 2018 WL 3326693, at \*29–31. In *Basho*, the controller wielded its contractual rights not for legitimate purposes, such as rejecting an unnecessarily dilutive financing, but rather to harm the entity for which it was a fiduciary so it would be vulnerable to a full takeover.

[128] *See C & J Energy Servs., Inc. v. Miami Gen. Empls.'*, 107 A.3d 1049, 1072 (Del. 2014) (instructing trial courts not to divest third parties of their contract rights absent a sufficient showing that the contract resulted from a fiduciary breach and that the counterparty aided and abetted the breach); *WaveDivision Hldgs., LLC v. Millennium Dig. Media Sys.*, 2010 WL 3706624, at \*17 (Del. Ch. Sept. 17, 2010) ("Delaware entities are free to enter into binding contracts without a fiduciary out so long as there was no breach of fiduciary duty involved when entering into the contract in the first place.").

Moreover, that claim would be derivative, and it is not clear that any after-acquiring stockholder would have standing to assert it.[129]

Finally, the plaintiff contends that fiduciary duties come into play because the Company made the Early Termination Payment under the Termination Agreement *after* the Merger closed. The plaintiff argues that by entering into the Termination Agreement, Lone Star and the Buyer Defendants created a new side deal, separate from the Tax Agreement, that the court must analyze independently.[130]

That contention elevates form over substance. When applying principles of equity for purposes of a claim like breach of fiduciary duty, a court looks to the substance rather than the form.[131] In substance, the Termination Agreement paid out the amount due under the Tax Agreement and confirmed that the Company's obligations under the Tax Agreement were satisfied. Arguably, the Termination Agreement was unnecessary, because the Tax Agreement already called for that

---

[129] *See Anadarko Petroleum Corp. v. Panhandle E. Corp.,* 1987 WL 16508, at *4 (Del. Ch. Sept. 8, 1987), *aff'd*, 545 A.2d 1171 (Del. 1988).

[130] *See* PAB 78 ("The [Termination Agreement's] separate negotiation and execution is a 'side-deal' that resulted in Lone Star receiving disproportionate consideration in the Merger."); *id.* at 79 ("Plaintiff is alleging Lone Star used its influence over the Merger process to get ASP Flag to pay the $74.8 million Early Termination Payment under the [Termination Agreement]—a new agreement wholly separate from the [Tax Agreement].").

[131] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983) ("[E]quity regards substance rather than form."); *In re Carlisle Etcetera LLC*, 114 A.3d 592, 607 (Del. Ch. 2015) ("Equity always attempts to ascertain, uphold, and enforce rights and duties which spring from the *real* relations of parties." (cleaned up)).

68

result. But it was good housekeeping and memorialized the parties' intent. It was not a new transaction.

Even accepting the plaintiff's contention, the only implication of treating the Termination Agreement as a new transaction would be to bring the case on all fours with *Martha Stewart*. That case involved the replacement of old agreements with substantively identical new ones. Here, the court would conduct the same analysis with the same result. The plaintiff has not pointed to anything that would distinguish the terms of the Termination Agreement from the outcome under the Tax Agreement. Assuming for purposes of analysis that Lone Star bargained for a new side deal to replace the Tax Agreement, Lone Star replaced its existing deal with an identical deal. That does not divert merger consideration; it maintains the *status quo*.

The plaintiff's claim that the Lone Star Defendants diverted merger consideration from the minority stockholders thus does not implicate the entire fairness test. It does not even state a claim on which relief can be granted.

### 4. The Claim Based On The Conduct Of The Sale Process

The Sale Process Claims next attack the Lone Star Defendants for how the sale process unfolded. According to the plaintiff, Lone Star "conducted the negotiations with bidders (using their favored advisors [Gibson Dunn] and RBC) to extract the structure that resulted in Lone Star receiving $74.8 million under the [Termination Agreement]."[132] In substance, the plaintiff contends that by controlling the sale

---

[132] PAB 76.

process and persistently seeking to find a buyer that would pay the full amount of the Early Termination Payment, the Lone Star Defendants breached their fiduciary duties. That theory does not trigger the entire fairness test. It also fails to state a claim on which relief can be granted.

The analysis again starts with the proper standard of review. For reasons explained at length elsewhere,[133] enhanced scrutiny governs a challenge to a sale process when a controller engineers a sale of the controlled company to a third-party for cash.[134] The fact that the controller conducts the sale and has an economic incentive to obtain the best price does not, standing alone, reduce the standard of review to the business judgment rule.[135] Fully informed approval by disinterested stockholders could reduce the standard of review to the business judgment rule under *Corwin*,[136] but Lone Star approved the Merger unilaterally by written consent.

To plead a claim for breach of fiduciary duty under the enhanced scrutiny standard of review, a plaintiff must plead facts supporting a reasonably conceivable inference that the sale process fell outside the range of reasonableness. When evaluating a sale process led by a fiduciary with a substantial stock position, the court can give weight to the economic alignment between the fiduciary's economic interests

---

[133] *See Presidio*, 251 A.3d at 249–50, 263–66.

[134] *McMullin v. Beran*, 765 A.2d 910, 919–20 (Del. 2000).

[135] *Id.*

[136] *See generally Corwin v. KKR Fin. Hldgs. LLC*, 124 A.3d 304 (Del. 2015).

and the outcome the fiduciary is charged with achieving. Just as conflicts of interest undermine the reasonableness of otherwise debatable decisions during a sale process, economic alignment reinforces the reasonableness of similar decisions.

Here, the complaint fails to plead facts suggesting a reasonable inference that the Lone Star Defendants engineered a sale process that fell outside the range of reasonableness. The Lone Star Defendants were fully incentivized to maximize the total consideration Lone Star received in a sale. Because the Early Termination Payment was fixed, Lone Star had an incentive to maximize the sale price. And if there is one thing that a private equity firm should be good at, it's extracting maximum value for an asset.

As in any sale process, the Lone Star Defendants made debatable decisions. But the complaint does not identify any decisions, individually or in the aggregate, that would take the sale process outside the range of reasonableness given Lone Star's substantial economic alignment with the stockholders as a whole. To the extent the plaintiff seeks to challenge how the sale process unfolded, the complaint fails to state a claim on which relief can be granted.

### 5. Fund IX Is A Proper Fiduciary Defendant.

In addition to contesting the Sale Process Claims as pled, the Lone Star Defendants argue that Fund IX is not a proper defendant because only Cypress, the investment vehicle through which Fund IX acquired and held its investment in the Company, owed fiduciary duties as a controller. By taking that position, the Lone Star Defendants assert that any claim for breach of fiduciary duty against a controller cannot extend beyond the immediate entity that owns the stock that provides control,

71

unless the plaintiff can pierce that entity's veil. If the plaintiff had asserted a legal claim against Cypress, such as a claim to enforce a debt, the Lone Star Defendants would be correct. For a claim for breach of fiduciary duty, the Lone Star Defendants are wrong.

"[T]he separate legal existence of juridical entities is fundamental to Delaware law, as are the correlative principles of limited liability and asset partitioning, but that does not mean that every legal doctrine stops at the corporate edge."[137] Those principles, however, operate to different degrees depending on the issue and type of entity.

Juridical entities regularly interact with the government (through regulation and taxation), with third parties through consensual transactions (through contract), and with third parties through nonconsensual transactions in (tort). Juridical entities also interact with internal constituencies, such as providers of capital, providers of labor, and the entities' own internal decision-makers.[138]

The principles of separate legal existence and limited liability have different implications across these dimensions, and different entities implement the principles to differing degrees. When interacting with the federal government for purposes of taxation, a corporation typically is treated as a separate legal entity. Partnerships,

---

[137] *Hawk Inv. Hldgs. Ltd. v. Stream TV Networks, Inc.*, 2022 WL 17661578, at *3 (Del. Ch. Dec. 14, 2022).

[138] *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. 2012) (citing Robert B. Thompson, *The Limits of Liability in the New Limited Liability Entities*, 32 Wake Forest L. Rev. 1, 3 (1997)).

limited partnerships, and LLCs typically are "pass-through" entities whose separate status is disregarded.[139]

When making consensual commitments to third parties via contract, corporations and LLCs are typically treated as separate legal entities. In a general partnership, the partnership is obligated to perform, but in the event of default, the general partners are individually liable. In a limited partnership, the partnership is obligated to perform, but at least one general partner must be individually liable. The same is true for tort obligations.

Numerous legal rules and doctrines circumvent the general principles of corporate separateness and legal liability. A government may choose to impose liability directly on owners or managers for particular activities. [140] By piercing the corporate veil, courts can enable contractual creditors to reach the assets of the owners of an entity.[141] Courts also may use piercing to benefit tort claimants, who additionally can recover from the individuals who committed the tort.[142]

The doctrine of piercing the corporate veil traditionally has not been applied to address equitable claims for breach of fiduciary duty. For claims against directors, it

---

[139] *See Feeley*, 62 A.3d at 667.

[140] *See* Thompson, *supra,* at 11 n.58.

[141] *See id.* at 9–10.

[142] *See id.* at 12; *see also* Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 Cornell L. Rev. 1036, 1058 (1991) (reviewing statistical occurrence of piercing cases based on an underlying tort).

has been unnecessary, because under Delaware law, the members of a board of directors of a Delaware corporation must be natural persons.[143]

Issues of corporate separateness arise because equity also imposes fiduciary duties on a party that controls a corporation generally or for purposes of a specific transaction. Breach of fiduciary duty is an equitable claim, and "equity regards substance rather than form."[144] Consequently, when imposing duties and potential accountability on a controller, it does not matter whether the control was exercised directly or indirectly through subsidiaries. Over a century ago, the Supreme Court of the United States rejected a corporate separateness defense similar to what Fund IX asserts here:

> The Southern Pacific contends that the doctrine under which majority stockholders exercising control are deemed trustees for the minority should not be applied here, because it did not itself own directly any stock in the old Houston Company; its control being exerted through a subsidiary, Morgan's Louisiana & Texas Railroad & Steamship Company, which was the majority stockholder in the old Houston Company. But the doctrine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustee for the minority does not rest upon such technical distinctions. It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation.[145]

---

[143] *See* 8 *Del. C.* § 141(d).

[144] *Monroe Park*, 457 A.2d at 737; *accord Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007) ("It is the very nature of equity to look beyond form to the substance of an arrangement.").

[145] *S. Pac. Co. v. Bogert*, 250 U.S. 483, 491–92 (1919).

"Delaware corporate decisions consistently have looked to who wields control in substance and have imposed the risk of fiduciary liability on the actual controllers."[146]

Fund IX is a proper defendant for the plaintiff's claims for breach of fiduciary duty. If the plaintiff had been able to identify another party that controlled Fund IX and plead sufficient facts to support the inference of control, then the plaintiff could have sued that party as well.

## B. The Sale Process Claims Against The Special Committee Defendants

The plaintiff also asserts Sale Process Claims against the Special Committee Defendants. The Special Committee Defendants do not seek to dismiss those claims on the merits. They only seek dismissal on the basis of exculpation. That makes sense. The Special Committee Defendants approved the Merger, just as the Lone Star Defendants did. To the extent entire fairness applies, then subject to analyzing the exculpation defense, they must join the Lone Star Defendants in proving that the Merger was entirely fair relative to the alternative of remaining independent. Subject to the exculpation defense, therefore, the complaint states a claim against the Special Committee Defendants.

---

[146] *Virtus Cap. L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *17 & n.6 (Del. Ch. Feb. 11, 2015) (collecting authorities). *E.g.*, *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257–59 (2006) (holding that controller of a control group consisting of LPs could be sued as a stockholder controller); *accord In re EZCORP Inc. Consulting Agr. Deriv. Litig.*, 2016 WL 301245, at *10 & n.2 (Del. Ch. Jan. 25, 2016) (citing authorities including *Primedia* to hold controller of a stockholder controller (a limited partnership) could be sued as a stockholder controller); *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *9–10 (Del. Ch. Sept. 28, 2015) (citing authorities including *Primedia* in holding that the controller of a control group, consisting of two LPs, could be sued as a stockholder controller).

## C. The Conclusion Regarding The Sale Process Claims

The complaint thus states one viable Sale Process Claim. The complaint sufficiently pleads that the Lone Star Defendants faced a conflict of interest that caused them to breach their fiduciary duties when deciding to pursue and ultimately approve a transaction that would trigger the Early Termination Payment, rather than continuing to operate the Company as an independent entity. The complaint sufficiently pleads that the Special Committee Defendants breached their fiduciary duties by deferring to the Lone Star Defendants and approving a sale, rather than saying "no" to the Merger. The Lone Star Defendants and the Special Committee Defendants must prove that the decision to sell was entirely fair compared to continuing to operate the Company as a standalone entity for the benefit of all of its stockholders. If they fail to prove that the decision was entirely fair, then they could be liable for the difference between (i) the greater value that stockholders could have obtained if the Company had remained independent and paid lower amounts under the Tax Agreement over time and (ii) the consideration received in the Merger. Otherwise, the Sale Process Claims are dismissed.

## IV. THE DISCLOSURE CLAIMS

The plaintiff next claims that the Lone Star Defendants and the Special Committee Defendants breached their duty of disclosure. Everyone agrees that the directors all owed the same duty of disclosure. No one argues that Mendoza, in his capacity as CEO, separately breached a distinct, officer-based duty of disclosure. The Lone Star Defendants do make a distinction for Lone Star: They contend that in a

76

board-approved and board-recommended transaction, Lone Star did not owe a separate duty of disclosure as a stockholder controller.

## A. The Disclosure Claim Against The Directors

The plaintiff alleges that the directors breached their fiduciary duties by failing to disclose material information in the Information Statement, then by failing to give stockholders sufficient time to consider the Supplement and demand appraisal. Both theories state claims on which relief can be granted.

"[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[147] A board seeks stockholder action when it presents stockholders with a transaction that requires a vote or an investment decision, such as whether to tender their shares or whether to pursue appraisal.[148] When a merger will trigger appraisal rights, the duty of disclosure applies even if the directors are not soliciting stockholder votes.[149]

---

[147] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997) (internal quotation marks omitted) (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)).

[148] *Malone*, 722 A.2d at 12; *see In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 57 ("[W]hen disclosing appraisal rights to stockholders, corporate directors must provide all material information necessary to make an informed decision to either approve the merger or dissent and seek appraisal.").

[149] *See NEA*, 292 A.3d at 147; *Nagy v. Bistricer*, 770 A.2d 43, 47–48, 60 (Del. Ch. 2000); *Turner v. Bernstein*, 776 A.2d 530, 534–35, 542 (Del. Ch. 2000).

Under Delaware law, a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[150] The inquiry does not require a substantial likelihood that the disclosure would have caused a reasonable investor to do something different.[151] Rather, the question is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[152]

"Delaware disclosure law also proscribes misleading partial disclosures. When fiduciaries undertake to describe events, they must do so in a balanced and accurate fashion, which does not create a materially misleading impression."[153] "[T]he disclosure of even a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders."[154]

---

[150] *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[151] *See id.* (explaining that materiality does not require "a substantial likelihood that [the] disclosure . . . would have caused the reasonable investor to change his vote" (quoting *TSC Indus.*, 426 U.S. at 449)).

[152] *Id.* (quoting *TSC Indus.*, 426 U.S. at 449).

[153] *Clements v. Rogers*, 790 A.2d 1222, 1240 (Del. Ch. 2001).

[154] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996).

"Whether disclosures are adequate is a mixed question of law and fact."[155] "At the motion to dismiss stage, [the court] need not determine whether each disclosure deficiency, alone, is sufficient to find a breach."[156] Rather, the court must "look at the disclosure allegations collectively."[157]

### 1. The Materiality Standard When The Only Decision Is Whether To Seek Appraisal

The defendants argue that the court must evaluate the defendants' disclosures in the context of a transaction where stockholders were not asked to vote. The defendants contend that while some disclosures might be material to stockholders when voting, those same disclosures would not be material to a stockholder when deciding whether to seek appraisal. That argument is misguided.

In *Skeen v. Jo-Ann Stores, Inc.*,[158] stockholder plaintiffs advanced a version of this argument, contending that when a merger only involved a decision to seek appraisal, the fiduciary defendants must disclose a greater degree of valuation-

---

[155] *Zirn v. VLI Corp.*, 621 A.2d 773, 777 (Del. 1993); *see Branson v. Exide Elecs. Corp.*, 1994 WL 164084, at *3 (Del. Apr. 25, 1994) (TABLE) (noting that questions of materiality "generally cannot be resolved on a motion to dismiss, but rather . . . must be determined after the development of an evidentiary record"); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *10 (Del. Ch. Jan. 18, 1996) (declining to rule that an omission was immaterial as a matter of law because "[a] question of materiality is difficult to treat as a question of law on a motion to dismiss," and "[i]n fact, issues of materiality are generally held to be mixed questions of law and fact, but predominantly questions of fact" and "are matters that in many instances require a rich factual context to responsibly decide").

[156] *Davidow v. LRN Corp.*, 2020 WL 898097, at *11 (Del. Ch. Feb. 25, 2020).

[157] *Id.*

[158] 750 A.2d 1170 (Del. 2000)

related information. The Delaware Supreme Court disagreed, holding that "there is no different standard for appraisal decisions."[159]

That makes sense, because the economic decision is the same. In both settings, the choice is between the merger consideration or a pro rata share of the standalone value of the corporation. When voting on a merger, a vote in favor reflects a decision to opt for the merger consideration. A vote against reflects a decision to opt for a pro rata share of standalone value, which the stockholder would receive by keeping its shares. For appraisal, doing nothing reflects a decision to opt for the merger consideration. Demanding appraisal reflects a decision to opt for a pro rata share of standalone value, which the stockholder receives by pursuing the appraisal proceeding. If the legal system could operate perfectly, the outcomes would be identical. Because the economic decision is the same, the disclosure requirements are the same. That is what *Skeen* held.

The post-*Skeen* evolution of Delaware law has only reinforced the logic of using the same standard. In 2015, the Delaware Supreme Court held in *Corwin* that a fully informed stockholder vote will extinguish sale process claims that otherwise would be reviewed under enhanced scrutiny.[160] The *Corwin* doctrine made it all the more

---

[159] *Id.* at 1171.

[160] *Corwin*, 125 A.3d at 308–14. Debate exists as to whether *Corwin* applied settled law or made new law. The *Corwin* decision asserts the former. *See id.* at 309 & n.19. For the contrary view, see James D. Cox, Tomas J. Mondino & Randall S. Thomas, *Understanding the (Ir)relevance of Shareholder Votes on M&A Deals*, 69 Duke L.J. 503, 507 (2019) (arguing that *Corwin* was a revolutionary case that "stands many corporate governance developments of the last fifty years on their head");

clear that directors must disclose facts relating to potential breaches of fiduciary duty (although they need not self-flagellate) so that stockholders can evaluate whether to vote for the deal and give up those claims.[161]

---

Charles R. Korsmo, *Delaware's Retreat from Judicial Scrutiny of Mergers*, 10 U.C. Irvine L. Rev. 55, 82–88 (2019) (closely analyzing the precedents cited in *Corwin* and concluding that "it is difficult to conclude that *Corwin* was simply an application of a deep strain of uncontroversial precedent. The picture of precedent presented in the opinion is only partial. At best, *Corwin* presents a case of selective and dubious citation. At worst, it represents the bootstrapping of prior Chancery Court dicta into binding precedent."); Iman Anabtawi, *The Twilight of Enhanced Scrutiny in Delaware M&A Jurisprudence*, 43 Del. J. Corp. L. 161, 192 (2019) (characterizing *Corwin* as a revolutionary development); Matthew D. Cain, Jill Fisch, Steven Davidoff Solomon & Randall S. Thomas, *The Shifting Tides of Merger Litigation*, 71 Vand. L. Rev. 603, 603–06 (2018) (naming *Corwin* as one of the most significant developments reducing the availability of shareholder suits challenging deals). But even if the critics are correct and *Corwin* was novel, that does not mean that *Corwin* represents bad policy. The latter is a separate question from the former.

[161] Thus, when those facts are not disclosed, *Corwin* cleansing is not available. *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *34–35 (Del. Ch. Mar. 15, 2023) ("Because facts concerning the sale-process breaches were not disclosed to stockholders, the stockholder vote was not fully informed. Defendants, therefore, are not entitled *Corwin* cleansing . . . ."); *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *13 (Del. Ch. Dec. 10, 2018) ("Plaintiff alleges that stockholders were entirely ignorant of the extent to which Tartavull influenced the negotiations and ultimate terms of the Transaction, not to mention his possible self-interested motivation for pushing an allegedly undervalued Transaction on the Company and its stockholders. Having found that these allegations are well-pled, this is enough to justify denying Tartavull business judgment deference at the pleading stage by virtue of the stockholder vote."); *van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) ("The proxy, as written, does not allow stockholders to determine whether the Opower negotiators were Yates and Laskey, who each received post-transaction employment and the conversion of unvested Opower options into unvested Oracle options, or other members of the Opower board who received only cash consideration. The vague language regarding the identities of the negotiators prohibited Opower stockholders from determining the interests of those fiduciaries who negotiated the deal on behalf of the stockholders, which I find to be a material disclosure violation. Thus, Defendants are not entitled to dismissal under *Corwin*.").

Starting in 2016, a trilogy of path-breaking Delaware Supreme Court decisions provided this court with pointed instruction about the relationship between the deal price in a third-party transaction and fair value in an appraisal.[162] Under the trilogy, the merger consideration takes pride of place among possible valuation indications. Both proponents and critics of the trilogy assert that a court should only consider awarding fair value above the deal price if the facts would support a claim for breach of fiduciary duty under the enhanced scrutiny standard.[163] It follows that fiduciaries

---

[162] *See Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 142 (2019) (reversing trial court's finding on fair value and determining fair value using deal price less the acquirer's estimate of synergies); *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 23 (Del. 2017) (reversing trial court's finding on fair value where sale process was sufficiently good that the deal price deserved "heavy, if not dispositive, weight"); *DFC Glob. Corp. v. Muirfield Value P'rs*, 172 A.3d 346, 388–89 (Del. 2017) (reversing trial court's finding on fair value where sale process was sufficiently good that the Court of Chancery's "decision to give one-third weight to each metric was unexplained and in tension with the Court of Chancery's own findings about the robustness of the market check")

[163] *See* Lawrence A. Hamermesh & Michael L. Wachter, *Finding the Right Balance in Appraisal Litigation: Deal Price, Deal Process, and Synergies*, 73 Bus. Law. 961, 962 (2018) (commending outcomes in *Dell* and *DFC* and arguing that "the Delaware courts' treatment of the use of the deal price to determine fair value does and should mirror the treatment of shareholder class action fiduciary duty litigation"); *id.* at 982–83 (citing *Dell* and *DFC* in observing: "What we discern from the case law, however, is a tendency to rely on deal price to measure fair value where the transaction would survive enhanced judicial scrutiny . . . . Thus, in order to determine whether to use the deal price to establish fair value, the Delaware courts are engaging in the same sort of scrutiny they would have applied under *Revlon* if the case were one challenging the merger as in breach of the directors' fiduciary duties." (footnote omitted)); Charles Korsmo & Minor Myers, *The Flawed Corporate Finance of* Dell *and* DFC Global, 68 Emory L.J. 221, 269 (2018) (explaining that *Dell* and *DFC* "conflate questions of fiduciary duty liability with the valuation questions central to appraisal disputes").

must disclose facts relating to potential breaches of fiduciary duty (although they need not self-flagellate) so that stockholders can evaluate whether to seek appraisal.

It therefore does not matter for the duty of disclosure that stockholders were not asked to vote on the Merger. The same materiality standard applies.

### a. The Failure To Disclose The Role Of The Tax Agreement

The complaint's allegations support a reasonable inference that the Information Statement failed to disclose the role that the Tax Agreement played in the sale process and the Merger. The "Background of the Merger" section does not refer to the Tax Act, the Tax Agreement, or the prospect for an Early Termination Payment as playing a role in the initiation of the sale process or the agreement to the Merger. The allegations of the complaint and the documents incorporated by reference support at least the following reasonable inferences:

- The Tax Act reduced the value to Lone Star of the ongoing stream of payments it would receive under the Tax Agreement and made the prospect of an Early Termination Payment more attractive. That combination caused the Lone Star Defendants to initiate the sale process.

- The Tax Agreement and the prospect of an Early Termination Payment prompted the creation of the Special Committee.

- The Tax Agreement and the prospect of an Early Termination Payment was a recurring focus of discussion during the sale process.

Yet the "Background of the Merger Section" does not refer to the Tax Agreement until potential buyers started referencing it expressly in their offers.

Despite the significance of the Tax Agreement, the Information Statement contained only two sentences describing it.[164] Twenty pages later, the Information Statement devotes two paragraphs to the Termination Agreement.[165] The Information Statement does not provide meaningful information about the calculation of the Early Termination Payment or why the payment was made. The plaintiff has stated a disclosure claim based on the Information Statement's failure to provide a sufficient description of the Tax Agreement and its role in the sale process.

### b. The Partial Disclosure Regarding RBC And Evercore's Fee Arrangements

The allegations of the complaint support a reasonable inference that the Information Statement failed to provide adequate disclosure regarding RBC and Evercore's fee arrangements. Recent Delaware Supreme Court decisions have stressed the importance of full and fair disclosure regarding financial advisor conflicts and compensation arrangements.[166] "Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of

---

[164] IS at 45.

[165] *Id.* at 65.

[166] *See City of Sarasota Firefighters' Pension Fund v. Inovalon Hldgs, Inc.*, --- A.3d ---,--, 2024 WL 1896096, at \*15–21 (Del. May 1, 2024); *City of Dearborn Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc.*, --- A.3d ---, --, 2024 WL 1244032, at \*16 (Del. Mar. 25, 2024).

strategic alternatives, the Court of Chancery has required full disclosure of investment banker compensation and potential conflicts."[167]

"[I]t is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts . . . . A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis."[168]

RBC received a success fee calculated based on an amount that included the consideration Lone Star received under the Tax Agreement. The Information Statement did not disclose that. The Information Statement merely stated that RBC would receive an "aggregate fee currently estimated to be approximately $8.3 million, which is contingent upon the closing of the Merger."[169]

Evercore received a similar success fee calculated based on an amount that included the consideration Lone Star received under the Tax Agreement. The Information Statement did not disclose that either. The Information Statement merely stated that Evercore would receive "a fee of $1.5 million upon delivery of the opinion to the Special Committee," plus "an additional transaction fee, estimated to

---

[167] *Brookfield*, --- A.3d at ---, 2024 WL 1244032, at *17 (cleaned up) (quoting *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011)).

[168] *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *8 (Del. Ch. June 27, 2008).

[169] IS at 41.

be approximately $4.0 million, based upon a percentage of the transaction value of the Merger, which is contingent upon the closing of the Merger."[170]

The lack of disclosure is particularly significant for Evercore, which served as the Special Committee's advisor. As the Delaware Supreme Court recently emphasized, "[a] special committee's advisor's conflicts are uniquely important."[171] Unlike RBC, Evercore's job was not to get a transaction done. Evercore's job was to help the Special Committee make sure that the transaction was fair to stockholders. Instead, Evercore was contingently compensated using a fee arrangement that aligned its interests with Lone Star's, and the Information Statement failed to disclose that fact.

RBC and Evercore argue that the amount of the consideration tied to the Early Termination Payment was not material to them. But materiality is evaluated from the perspective of a reasonable stockholder, not from the perspective of the directors or the financial advisor.[172] Regardless, "[i]t does not matter whether the financial advisor's opinion was ultimately influenced by the conflict of interest; the presence of an undisclosed conflict is still significant."[173] "There is no rule that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion

---

[170] IS 39.

[171] *Inovalon*, --- A.3d at ---, --- 2024 WL 1896096, at *15.

[172] *Id.*; *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994).

[173] *Brookfield*, --- A.3d at ---, --- 2024 WL 1244032, at *17.

was actually affected by the conflict."[174] The plaintiff has stated a claim on which relief can be granted based on the incomplete disclosures about the financial advisors' compensation.

### c. The Partial Disclosure Of RBC and Gibson Dunn's Relationships To Lone Star

The allegations of the complaint support a reasonable inference that the Information Statement failed to provide adequate disclosure about RBC's relationships with Lone Star. "It is imperative that stockholders be able to decide for themselves what weight to place on a conflict faced by the financial advisor."[175] As the Delaware Supreme Court recently made clear, stockholders should also understand any conflicts faced by the lawyers involved in the deal.[176]

The Information Statement introduced RBC by identifying the firm as having "a long-standing relationship with the Company."[177] The Information Statement did not identify RBC's deeper relationship with Lone Star. In fact, Lone Star paid RBC

---

[174] *Id.* (cleaned up) (*quoting In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *16 (Del. Ch. Oct. 2, 2009)).

[175] *John Q. Hammons*, 2009 WL 3165613, at *16.

[176] *Brookfield*, --- A.3d at ---, 2024 WL 1244032, at *19 ("Kirkland's conflicts at issue involved prior representations of Brookfield and its affiliates and a concurrent representation of a Brookfield affiliate on an unrelated transaction. . . . The Proxy failed to disclose Kirkland's prior and concurrent conflicts. Even though, standing alone, Kirkland's prior conflicts with Brookfield may not have been sufficient to state a claim, we hold that it is reasonably conceivable that the details of Kirkland's conflicts, and particularly, the concurrent conflict, were material facts for stockholders that required disclosure." (footnotes omitted)).

[177] IS at 17.

87

over $73 million in a span of 30 months from 2016 to June 2018, plus another $5.9 million from the Company during the same time period. The Information Statement consistently described RBC as the Company's financial advisor. It did not acknowledge that when Lone Star was considering a sale of its shares, RBC acted as Lone Star's financial advisor.

The Information Statement was similarly parsimonious regarding Gibson Dunn. The allegations of the complaint support a reasonable inference that the Information Statement failed to provide adequate disclosure about Gibson Dunn's relationships with Lone Star. As with RBC, the Information Statement introduced Gibson Dunn by identifying the firm as having "a long-standing relationship with the Company."[178] The Information Statement did not identify Gibson Dunn's deeper relationship with Lone Star, which warranted Meyer introducing the Gibson Dunn lead lawyer to RBC as "our partner . . . who has worked extensively with us across our portfolio."[179]

The Information Statement also consistently described Gibson Dunn as the Company's counsel, without acknowledging that when Lone Star was considering a sale of its shares, Gibson Dunn acted as Lone Star's counsel. In particular, at the Board meeting on January 21, 2020, the minutes note that Gibson Dunn appeared as

---

[178] *Id.*

[179] Compl. ¶ 51.

legal counsel for Lone Star. The Information Statement discusses that Board meeting but does not mention the capacity in which Gibson Dunn appeared.

### d.  The Other Disclosure Claims

The plaintiff has advanced other disclosure claims. Because the foregoing allegations are sufficient to state a claim on which relief can be granted, the court does not reach the other allegedly false or misleading statements or omissions in the Information Statement.

### 2.  The Timing Of The Supplement

Directors not only have a duty to disclose information, they have a duty to provide stockholders with sufficient time to take the information into account. The plaintiff contends that stockholders did not have sufficient time to consider the Supplement before the appraisal deadline.

A court must exercise discretion when determining whether stockholders have had a sufficient opportunity to consider and receive information. The DGCL requires twenty days' notice for a merger,[180] making that amount of time presumptively sufficient under Delaware law.[181] When enjoining a meeting of stockholders pending

---

[180] 8 *Del. C.* § 251(c).

[181] *See La. Mun. Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1192 (Del. Ch. 2007) (recognizing "statutorily required notice period of twenty days"); *Nantahala Cap. P'rs II Ltd. P'ship v. QAD Inc.*, 2021 WL 4776052, at *1 (Del.Ch. Oct. 12, 2021) (ORDER) (same).

the issuance of supplemental disclosures, the court has often required ten days for stockholders to digest the information and invariably required at least five days.[182]

The Company issued the Supplement on December 21, 2020. The deadline for demanding appraisal was December 24, just three days later. And the Supplement was issued during the holiday season and in the midst of the COVID-19 pandemic.

No decision supports such a short notice period. To the contrary, this court has issued a temporary restraining order where directors issued a Form 8-K containing additional information that gave stockholders just three days to consider it before voting.[183] It is reasonably conceivable that the directors breached their fiduciary duties by failing to provide stockholders with sufficient time to act on the information included in the Supplement.

## B. Lone Star's Status As A Defendant For The Disclosure Claims

Lone Star argues that despite being a stockholder controller that owed fiduciary duties, Lone Star did not owe an independent fiduciary duty of disclosure to the unaffiliated stockholders because the Merger was a third-party transaction. For the reasons stated in the *Presidio* decision, that assertion is correct.[184] The

---

[182] *See Vento v. Curry*, 2017 WL 1076725, at *4 (Del. Ch. Mar. 22, 2017) (five days); *Rodgers v. Bingham*, 2017 WL 2424259, at *1 (Del. Ch. June 2, 2017) (ORDER) (ten days). *In re Complete Genomics, Inc.*, 2012 WL 6093956 (Del.Ch. Dec. 4, 2012) (ORDER) (ten days); *In re Art Tech. Gp., Inc. S'holders Litig.*, 2010 WL 5184244 (Del.Ch. Dec. 21, 2010) (ORDER) (ten days).

[183] *La. Mun. Police Emps.' Ret. Sys. v. Crawford*, 2007 WL 625006, at *1 (Del. Ch. Feb. 13, 2007).

[184] *Presidio*, 251 A.3d at 288.

director defendants owed a duty of disclosure, and it was they who approved the Information Statement and the Supplement. Lone Star did not owe a separate duty of disclosure for purposes of the Merger. The plaintiff also has not alleged that Lone Star chose to speak, which could have required Lone Star to speak truthfully and completely.

A different result might be warranted if the plaintiff alleged that Lone Star possessed material information that the Board did not, but that is not what the plaintiff contends. On the facts alleged, the Company's directors owed a duty of disclosure. Lone Star did not.

## V. THE EXCULPATION DEFENSE

Mendoza and the Special Committee Defendants raise an exculpation defense. At the pleading stage, those defendants cannot rely on exculpation to defeat the limited claims for breach of fiduciary duty that survive pleading stage review. At a later stage of the case, the exculpation defense may well succeed.

The Delaware Supreme Court has instructed that if a plaintiff "seek[s] only monetary damages" from "a director who is protected by an exculpatory provision," then to survive a motion to dismiss, the plaintiff "must plead non-exculpated claims against [the] director . . . , regardless of the underlying standard of review for the board's conduct—be it *Revlon*, *Unocal*, the entire fairness standard, or the business judgment rule."[185] "So applied, the existence of an exculpatory provision operates

---

[185] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1175–76 (Del. 2015) (footnotes omitted).

more in the nature of an immunity, comparable to the extent to which sovereign immunity typically protects government employees from suit, rather than as an affirmative defense."[186]

The Company's certificate of incorporation contains an exculpation provision. It states: "To the fullest extent permitted by the DGCL as the same exists or as may hereafter be amended, no director of the corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director."[187] Section 102(b)(7) and its exceptions foreclose exculpation for breaches of the duty of loyalty, including its subsidiary element of good faith, while permitting exculpation for breaches of the duty of care.[188] Therefore, to plead a non-exculpated claim, a complaint must allege "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[189]

### 1. Mendoza

Mendoza argues that the claims asserting that he breached his duties must be dismissed because he is entitled to exculpation. Under *Cornerstone*, a plaintiff may

---

[186] *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 130 A.3d 934, 940 (Del. Ch. 2016).

[187] DX 3, art. XI § 11.1.

[188] *Presidio*, 251 A.3d at 253.

[189] *Cornerstone*, 115 A.3d at 1179–80.

establish a non-exculpated claim by pleading facts supporting an inference that a nominally independent and disinterested director nevertheless acted disloyally.[190]

The complaint's allegations call into question Mendoza's independence. A fiduciary is not independent when "the fiduciary is 'sufficiently loyal to, beholden to, or otherwise influenced by an interested party' to undermine the fiduciary's ability to judge the matter on its merits."[191] "Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of either a controller or a conflicted board majority."[192] Mendoza was the CEO of a portfolio company that Lone Star controlled. He was not independent.

The complaint's allegations call into question Mendoza's disinterestedness. "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[193] Mendoza held a 2.75% interest in any amounts received under the Tax Agreement. Mendoza attempts to rationalize his interest by observing that he held a greater equity stake in the Company. That misses the point. Like Lone Star, Mendoza stood to gain

---

[190] *Id.*

[191] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2022 WL 484420, at *15 (Del. Ch. Feb. 17, 2022) (quoting *In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *68 (Del. Ch. May 6, 2021) (citations omitted)).

[192] *NEA*, 292 A.3d at 161, n.34 (collecting cases).

[193] *Rales*, 634 A.2d at 936.

consideration both through a pro-rata share of merger consideration *and* through his interest in the Tax Agreement. He thus faced a conflict of interest when deciding between an alternative that would trigger increased consideration under the Tax Agreement and an alternative that would not.

To argue for dismissal, Mendoza cites a statement in one decision to the effect that "[s]uccessfully impugning a director's independence with respect to voting on transactions . . . should be more difficult than challenging that same independence with respect to assessing a demand."[194] Mendoza's counsel has taken that language out of context and presented the quotation as if it related to pleading-stage analysis, which it did not; the court was analyzing a motion for summary judgment to determine what standard of review would govern a transaction at trial.[195] Transplanted to the pleading stage by defense counsel, the statement gets matters backwards. Rule 23.1 governs the analysis of demand futility and requires that the complaint plead particularized facts supporting a director's inability to consider a demand. When defendants move to dismiss a challenge to a transaction under Rule 12(b)(6), the notice pleading standard from Rule 8 applies. The proposition that a challenge to a transaction must clear a higher standard is also counter intuitive because the test for director disinterest and independence is the same in both

---

[194] *Sciabacucchi v. Liberty Broadband Corp.*, 2022 WL 1301859, at \*14 (Del. Ch. May 2, 2022) (emphasis omitted).

[195] *Id.* at \*14. Defense counsel also cites *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917 (Del. Ch. 2023), which likewise did not address a pleading-stage motion. The *Oracle* decision involved a special litigation committee. *Id.* at 929.

contexts: whether the director could make the decision in question (be it a transaction or a demand) entirely on the corporate merit and without being influenced by any personal or extraneous considerations.[196] The passage from which defense counsel excises the quotation reflects the sentiment that it will be more difficult for a director to decide to sue fellow directors or a stockholder controller, so therefore it should be easier to plead demand futility because of that reluctance than it is to plead that a director voted for a transaction to curry favor with fellow directors or a controller. Whatever its merits as commentary on human nature, it does not reflect how Delaware law works. The Delaware Supreme Court recently confirmed that for policy reasons surrounding the need to screen the ability of stockholder plaintiffs to assert derivative claims, the demand futility regime exists independent of the principles for analyzing Rule 12(b)(6) motions.[197]

Mendoza also cites a case in which the court held that a CEO was entitled to exculpation under similar circumstances—a third-party sale in which the stockholder controller inferably extracted a side benefit. The court acknowledged that "[t]he contention is theoretically plausible given that [the defendant] was the CEO of [the target company] when the [t]ransactions were negotiated and he may have been motivated to curry favor with [the seller] or [the buyer] to maintain his position as

---

[196] *Cede*, 634 A.2d at 362 (transactional setting) (subsequent history omitted); *accord United Food*, 262 A.3d at 1060 (demand futility context).

[197] *See In re Match Gp., Inc. Deriv. Litig.*, --- A.3d ---, ---, 2024 WL 1449815, at *16 (Del. Apr. 4, 2024).

CEO . . . ."[198] The court nevertheless held that the CEO was entitled to exculpation because the complaint pled "no facts . . . specific to [the CEO] that indicate that he advanced [the seller's] self-interest as plaintiff theorizes."[199] Yet there, as here, the CEO took steps during the sale process to facilitate the deal and voted in favor of the transaction. A complaint that pleads a "theoretically plausible" basis for self-interest has cleared the Rule 12(b)(6) hurdle, which requires only a reasonably conceivable theory of self-interest.

A claim for breach of fiduciary duty does not require a showing of inherently wrongful or disloyal conduct. Such a showing is sufficient, but not necessary. All that a claim for breach of fiduciary duty requires is a showing that the conflicted fiduciaries voted in favor of the interested transaction. At that point, if the complaint states a reasonably conceivable theory as to why the director was not disinterested or independent, then the complaint has stated a reasonably conceivable claim for a breach of the duty of loyalty, and exculpation is unavailable. When a court finds that a claim of disloyalty is "theoretically plausible," that is more than enough to survive pleading stage review.

For purposes of the remaining claim for breach of fiduciary duty that survives pleading stage review, Mendoza is no different than the Lone Star Directors. The

---

[198] *Klein*, 2018 WL 6719717, at *18.

[199] *Id.*

complaint therefore states a claim against Mendoza as a director to the same degree that it states a claim against the Lone Star Directors.

## 2. The Special Committee Defendants

The Special Committee Defendants also argue for their dismissal based on the Exculpation Provision. At the pleading stage, exculpation is not available because the complaint's allegations, if proven, could support a breach of the duty of loyalty.

To implicate the Special Committee Defendants in a non-exculpated claim, the plaintiff alleges bad faith.[200] The duty of loyalty requires that disinterested, independent directors act in good faith.[201] A director fails to act in good faith when "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ."[202] A plaintiff can call into question a director's good faith by pleading facts supporting an inference that the director acted for some other purpose.[203] "Bad faith can be the result of "any emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare

---

[200] The plaintiff does not advance any credible arguments that would support an inference that the Special Committee Defendants were interested in the Merger or were not independent from someone who was. Khan and Underhill had a de minimis interest in the Early Termination Payment of less than $15,000 each. That is not sufficient to call their independence into question.

[201] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016).

[202] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[203] *Id.* at 53 (noting that Delaware law "clearly permits a judicial assessment of director good faith" at the pleading stage); *accord eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010).

of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[204] A director can also act in bad faith by engaging in an "intentional dereliction of duty" such as by showing a "conscious disregard for one's responsibilities."[205]

Court of Chancery Rule 9(b) states that a person's "condition of mind may be averred generally."[206] That means the plaintiff must plead facts which, when viewed holistically, support a reasonable inference that the person could have acted with the requisite mental state. "Even after a trial, a judge may need to make credibility determinations about a defendant's subjective beliefs by weighing witness testimony against objective facts."[207] And even then, the members of the Court of Chancery "cannot peer into the hearts and souls of directors to determine their subjective intent with certainty."[208] "Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications. Objective facts remain logically

---

[204] *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.); *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

[205] *Disney*, 906 A.2d at 67; *accord Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009).

[206] Ct. Ch. R. 9(b).

[207] *Allen v. Encore Energy P'rs, L.P. (Encore I)*, 72 A.3d 93, 106 (Del. 2013).

[208] *Id.* (cleaned up).

and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief."[209]

Although lawyers routinely object that witnesses cannot speculate about someone else's state of mind, there is actually nothing special about it.

> While "mind reading" might sound like a mentalist magic trick, for cognitive scientists it refers to the very pedestrian capacity we all have for figuring out what another human being is thinking . . . . Other people's minds are opaque to us, so we cannot observe them directly. And yet, when someone walks toward the water fountain on a hot day, we know she wants a drink. When someone yelps after stubbing her toe, we know she feels pain. When someone aims an arrow at a target, we know she intends to hit it. We take in observable data about a person and infer something about her unobservable mental life.[210]

To get at a person's unobservable mental state, we look at what the person did and the circumstances in which they did it.[211]

Cases involving allegations of bad faith are difficult where there is no smoking gun, but where there is evidence suggesting a problematic intent. As Chancellor Allen explained:

> Rarely will direct evidence of bad faith—admissions or evidence of conspiracy—be available. Moreover, due regard for the protective nature of the stockholders' class action, requires the court, in these cases, to be suspicious, to exercise such powers as it may possess to look

---

[209] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014).

[210] Mihalis Diamantis, *How to Read a Corporation's Mind, in The Culpable Corporate Mind* 222–23 (Elise Bant ed., 2023) (footnotes omitted).

[211] *Id.*

imaginatively beneath the surface of events, which, in most instances, will itself be well-crafted and unobjectionable.[212]

Chancellor Allen made those observations when ruling on a preliminary injunction application, after the plaintiff had the opportunity to conduct discovery and take depositions. At the pleading stage, his admonition carries even greater weight. Here, the plaintiff has pled enough, but only barely.

The plaintiff starts by alleging that the Board formed the Special Committee "to protect the interests of the minority stockholders in any sale transaction that might involve acceleration of the Tax Agreement because of Lone Star's conflict of interest . . . ."[213] That is a reasonable inference.

The plaintiff next points to the resolutions that empowered the Special Committee to (i) investigate possible transactions, (ii) evaluate the terms of any possible transactions, (iii) participate in negotiations with relevant third parties regarding any element of a possible transaction, (iv) participate in negotiations of the terms of any definitive agreement with respect to any possible transactions (the execution of which was subject to Board approval), (v) report its recommendations and conclusions to the Board, and (vi) determine not to pursue any possible transaction. Read in conjunction with the Board's reason for creating the Special

---

[212] *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *12 (Del. Ch. Aug. 8, 1988).

[213] PAB at 102; *see* Compl. ¶¶ 59–60.

Committee, those resolutions were not just grants of authority. They embodied what the Special Committee was supposed to do.

The plaintiff alleges that the Special Committee Defendants "consciously disregarded their duties and affirmatively chose not to exercise any of the authority granted to them."[214] The plaintiff points to the following events:

- On September 21, 2018, the Special Committee resolved to hire its own financial advisor, yet the Special Committee did not follow through until September 10, 2020, nearly two years later.[215]

- On October 2, 2018, the Special Committee identified "potential incentives created by the structure of RBC's compensation and determined that it should attempt to renegotiate this structure so that no payments were dependent on amounts paid to settle the [Tax Agreement]"[216] There is no record of any effort to actually do that.

- On October 17, 2018, before being retained, Evercore gave a presentation about precedent transactions involving tax receivable agreements. The presentation identified one transaction in which the parties negotiated to eliminate an early termination payment. In other precedents, Evercore identified amounts paid, but did not indicate that they were contractually determined. Evercore's presentation suggested that the amount of the Early Termination Payment could be negotiated, but the Special Committee made no effort to negotiate with Lone Star concerning the Tax Agreement payment.[217]

- In the middle of the sale process, on March 8, 2019, Lone Star asked the Special Committee to let Gibson Dunn and RBC switch sides and begin representing Lone Star against the Company in a squeeze-out. The Special Committee met

---

[214] PAB at 102; *see* Compl. ¶ 60–61.

[215] Compl. ¶¶ 63, 108.

[216] *Id.* ¶¶ 65, 102.

[217] *Id.* ¶ 66–67.

101

and adjourned without deciding whether to grant the request. There is no indication that the Special Committee had any objection.[218]

- After its March 2019 meeting, the Special Committee did not meet until January 2020, ten months later, when the Special Committee convened for fifteen minutes to approve a non-disclosure agreement between the Company, Lone Star, and CD&R.[219]

- After the January 2020 meeting, the Special Committee did not meet for another seven months. During that period, the Lone Star Defendants continued negotiations with CD&R and other potential acquirers.[220]

- On September 2, 2020, the Special Committee met and decided to reject American's request for exclusivity. *The full Board had already rejected that request five days earlier.*[221]

- On September 8, 2020, the Board decided that a full termination payment to Lone Star under the Tax Agreement would be a given in any transaction. That should have been an issue for the Special Committee to address.[222]

- On September 10, 2020, the Special Committee formally retained Evercore. The Special Committee approved the same compensation structure for Evercore that the Special Committee and its counsel had flagged as a problem for RBC.[223]

- After the meeting on September 10, 2020, the Special Committee went two months without meeting again. During that period, the Lone Star Defendants and RBC conducted the sale process.[224]

---

[218] *Id.* ¶¶ 72–74.

[219] *Id.* ¶ 81

[220] *Id.* ¶¶ 84–88, 91.

[221] *Compare* DX 25 at 2, *with* DX 26 at 2–3.

[222] Compl. ¶ 105.

[223] *Id.* ¶¶ 102, 108.

[224] *Id.* ¶¶ 109, 138.

- The Board, not the Special Committee, decided to end the sale process after receiving American's $19.25 offer.[225]

-  The Board, not the Special Committee, approved the exclusivity agreement with American.[226]

- The Special Committee's advisor, Evercore, advised the Board about the superiority of American's offer before the Special Committee had met to evaluate it.[227]

- The Special Committee approved the Merger and recommended it to the Board without any changes.[228]

The plaintiff argues that those facts, taken as a whole, support an inference that the Special Committee acted as a pliant tool for Lone Star, happy to be of use.

The allegations state a claim for breach of the duty of care, but it is a closer call whether they rise to the level of bad faith. They describe a Special Committee that acted only when prompted by Lone Star and repeatedly went into hiding for months while the sale process was unfolding. More than once, the Special Committee acted as a retroactive rubber stamp by purporting to discuss or approve issues that the full Board had already addressed. The Special Committee strikingly opted to hire Evercore using the same compensation structure that the Special Committee had flagged as a conflict for RBC. At one point, the Chair of the Special Committee

---

[225] *Id.* ¶ 137.

[226] *Id.*

[227] *Id.* ¶¶ 136–38.

[228] *Id.* ¶ 140; DX 38.

revealed the real power structure by asking Lone Star if he could share information with the Special Committee's advisors.

At the pleading stage, close calls go to the plaintiff. The constellation of facts that the plaintiff has alleged supports an inference that the Special Committee Defendants consciously disregarded their responsibilities and acted to facilitate the transaction that Lone Star wanted.

The Special Committee Defendants made it easier for the court to rule against them at the pleading stage by misrepresenting the law and the factual record. When describing the legal standard, the Special Committee claimed that "the actions of the fiduciary alleged to have acted in bad faith must be 'so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other ground.'"[229]

The Delaware Supreme Court has rejected that standard. In *Kahn v. Stern*, the Delaware Supreme Court considered an appeal in which the Court of Chancery dismissed claims against directors for failing to plead bad faith.[230] While agreeing with the result, Chief Justice Strine went out of his way to state that

> to the extent that the Court of Chancery's decision might be read as suggesting that a plaintiff in this context must plead facts that rule out any possibility other than bad faith, rather than just pleading facts that support a rational inference of bad faith, we disagree with that statement.[231]

---

[229] SC OB at 26, Dkt. 75 (quoting *Leung v. Schuler*, 2000 WL 1478538, at *6 (Del. Ch. Oct. 2, 2000), *aff'd*, 783 A.2d 124 (Del. 2001) (TABLE)).

[230] 183 A.3d 715, 715 (Del. 2018) (ORDER).

[231] *Id.*

104

In support, he cited *Brinckerhoff*, a 2017 decision in which the Delaware Supreme Court overruled an earlier precedent in which the justices had used the standard of "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[232] The *Brinckerhoff* decision expressly overruled that prior decision and held that to plead action not in good faith, a plaintiff need only plead facts supporting an inference that the defendant did not reasonably believe that the transaction was in the best interests of the entity or its equity holders.[233]

To be sure, showing that conduct is "inexplicable on any ground than bad faith" remains one means of establishing bad faith, but a plaintiff is not required to plead facts meeting that standard to survive a motion to dismiss. A plaintiff need not "plead facts that rule out any possibility other than bad faith."[234] At trial, a plaintiff need not rule out other explanations; the plaintiff need only show by a preponderance of the evidence that the fiduciary acted for a purpose other than the best interest of the corporation.[235] Likewise, at the pleading stage, a plaintiff need only plead facts

---

[232] *Id.* at *1 n. 5 (citing *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 258–60 (Del. 2017)).

[233] *Brinckerhoff*, 159 A.3d at 258–60.

[234] *Kahn*, 2018 WL 1341719, at *1.

[235] *See Brinckerhoff*, 159 A.3d at 259–60.

supporting a reasonably conceivable inference that the fiduciary acted for a purpose other than the best interest of the corporation.[236]

The Special Committee Defendants did not cite *Kahn v. Stern* or *Brinkerhoff*. Those cases are not only pertinent authority in the controlling jurisdiction, they are controlling cases from the highest court in the controlling jurisdiction.

The Special Committee Defendants also misstated the facts. They devoted much of their brief to claiming that the plaintiff's allegations were inconsistent. According to the Special Committee Defendants, it cannot simultaneously be true that Lone Star excluded the Special Committee Defendants from the sale process, while at the same time be true that the Special Committee Defendants failed to involve themselves in the sale process or assert their authority. As the Special Committee Defendants sum it up, they allegedly "were both intentionally excluded from the process . . . and simultaneously missing in action."[237]

Those allegations are not contradictory; they are consistent. The complaint alleges that the Special Committee had the authority to play a meaningful role in the sale process. The resolutions creating the Special Committee support that allegation. Yet the Special Committee did not engage meaningfully in those tasks. One reason was that the Special Committee did not assert itself. It deferred to Lone Star. Another

---

[236] *See Kahn*, 2018 WL 1341719, at *1 (applying *Brinkerhoff* test for exculpatory provision in certificate of incorporation). *See generally Goldstein v. Denner,* 2022 WL 1671006, at *41 (Del. Ch. May 26, 2022).

[237] SC RB at 2–3, Dkt 99.

106

reason was that the Lone Star Defendants did not involve the Special Committee Defendants in the process. Lone Star preferred to quarterback the deal on its own. Neither aspect conflicts with the other. If someone barges into my house uninvited, I have the right to exclude them. If I do nothing, an observer could both criticize the trespasser for not respecting my property rights *and* criticize me for not asserting them. Transplanted to this case, the Lone Star Defendants are the intruder, and the Special Committee is the homeowner. According to the plaintiff, the Lone Star Defendants barged through the resolutions designed to put the Special Committee in charge of the sale process, and the Special Committee made no effort to assert its rights and kick them out.

The Special Committee Defendants next try to argue that it is not reasonable to infer that the Board created the Special Committee to address the conflict of interest presented by the Tax Agreement. As noted, that was a reasonable inference. Indeed, the recitals in the written consent that created the Special Committee stated:

> WHEREAS, seven of the ten members of the Board of the Company are employees or persons otherwise affiliated with [Lone Star], a majority stockholder of the Company and a party to [the Tax Agreement];
>
> WHEREAS, upon the occurrence of the Change of Control (as defined in the [Tax Agreement]), all obligations of the Company under the [Tax Agreement], including the Company's obligation to make significant payments to Lone Star, may, at the election of Lone Star be accelerated;
>
> . . .

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby designates the Special Committee . . . .[238]

Unabashed, the Special Committee Defendants argued that "the [Tax Agreement] is not mentioned in even one of the 'resolved further' paragraphs setting forth the resolutions of the Board."[239] True. *It was in the WHEREAS clauses that set the stage for the entire written consent, including the resolutions.*[240]

The Special Committee Defendants also argued incoherently that the nature of the Special Committee's "supposed purpose has no bearing on the question of conscious disregard [of duty]."[241] Whether a party has consciously disregarded its duty turns on whether the duty existed. Whether a duty existed depends on what the party has been charged with doing. The fact that the resolutions creating the Special Committee referenced the Tax Agreement and charged the Special Committee with participating in the sale process supports a reasonably conceivable inference about what the Special Committee was supposed to do. The complaint depicts a Special Committee that consciously failed to fulfill its charge.

Finally, and most bizarrely, the Special Committee Defendants contended that they could not shoulder any responsibility for the outcome of the sale process because they did not have any leverage. They tried to distinguish the plaintiffs' precedents as

---

[238] DX 11 at 1–2.

[239] SC RB at 14, Dkt. 99.

[240] DX 11 at 1.

[241] SC RB at 14, Dkt. 99.

involving committees with the power to say "no."[242] The Special Committee Defendants thus implied that they lacked the power to say "no." But here is what the empowering resolutions said: "**RESOLVED FURTHER**, that the Board shall not approve or recommend in favor of a Possible Transaction without a prior favorable recommendation from the Special Committee."[243] The Special Committee Defendants had the power to say "no."

Those arguments are so off base that they reinforce the plaintiff's allegations about a Special Committee that never understood what it was supposed to do. If their brief is to be believed, neither the Special Committee Defendants nor their counsel (the same firm that advised them during the sale process) thought they could say "no" to the Merger or that they had any obligation to carry out any of the tasks set forth in the implementing resolutions. That is hard to credit, but it would help explain why the Special Committee acted as it did. For present purposes, it reinforces a pleading-stage inference of bad faith.

During the sale process and when evaluating the Merger, the Special Committee Defendants owed a duty of loyalty to the stockholders to seek the alternative that maximized the value of their residual claims without regard to the particular interests of Lone Star. That alternative could well have been no

---

[242] *See id.* at 22–24 (purporting to distinguish on that basis *Bertreau v. Glazek*, 2021 WL 2711678 (Del. Ch. June 30, 2021); *In re Dell Techs. Inc. Class V. S'holders Litig.*, 2020 WL 3096748 (Del. CH. June 11, 2020); and *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963 (Del. Ch. 2000)).

[243] DX 11 at 2.

transaction at all. At the pleading stage, it is reasonable to infer that the Special Committee Defendants consciously disregarded their duties and chose instead to go along with what the Lone Star Defendants wanted.

## VI.    THE AIDING AND ABETTING CLAIMS

In addition to asserting claims for breach of fiduciary duty against the fiduciary defendants, the complaint asserts the Aiding and Abetting Claims against RBC, Evercore, and the Buyer Defendants. The complaint states an aiding and abetting claim against the financial advisors, but not against the Buyer Defendants.

To plead a claim for aiding and abetting, the complaint must allege facts to support four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by a non-fiduciary defendant, and (iv) damages proximately caused by the breach.[244] To establish knowledge, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper."[245] "[T]he question of whether a defendant acted with *scienter* is a factual determination."[246] Under Rule 9(b), a plaintiff can plead knowledge generally; "there is no requirement that knowing participation be pled with particularity."[247] For purposes of a motion to dismiss under

---

[244] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015).

[245] *Id.* at 862 (cleaned up).

[246] *Id.*

[247] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014).

110

Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge.[248]

## A.     RBC

The complaint contends that RBC aided and abetted the Lone Star Defendants in the breaches of fiduciary duty that gave rise to the Sale Process Claims. The plaintiff contends that while nominally working as the Company's banker, RBC actually served Lone Star's interests.

This decision has already held that the complaint pleads a claim for breach of fiduciary duty against the Lone Star Defendants based on the conflicted decision to pursue a Change of Control transaction and ultimately enter into the Merger. For the aiding and abetting claim against RBC, the key element is knowing participation.

"To show that a financial advisor acted with *scienter*, a stockholder plaintiff typically points to evidence of a conflict of interest diverting the advisor's loyalties . . . ."[249] The conflict of interest can arise from multiple sources, including a long-standing relationship or a compensation arrangement.

RBC had both. The Company hired RBC to serve as its financial advisor, but RBC's longstanding relationship with Lone Star and the structure of its success fee aligned RBC's interests with Lone Star's interests. The complaint pleads facts

---

[248] *Id.*; *see Wells Fargo & Co.*, 1996 WL 32169, at *11 ("[O]n the question of pleading knowledge, however, Rules 12(b)(6) and Rule 9(b) are very sympathetic to plaintiffs.").

[249] *Rural Metro*, 88 A.3d at 100.

supporting a reasonable inference that this was not a hypothetical conflict. RBC inferably acted as Lone Star's financial advisor and served Lone Star's interests.

This court has recognized that "a merger advisor . . . with a preexisting personal relationship with key actors at the seller could cater to their interests" and that "[s]uch catering might privilege the insiders' preferred deal over a more lucrative alternative that makes the shareholders better off."[250] RBC had a deep relationship with Lone Star. Between January 2016 and June 2018, RBC received $72.7 million in fees for services provided to Lone Star and its affiliates,[251] plus another $5.9 million from the Company.[252] Those engagements included serving as one of the book-running managers when Lone Star took the Company public in 2017[253] and serving as one of three joint book-running managers for Lone Star's secondary offering of Company stock in 2019.[254] The potential sale of the Company provided RBC with another opportunity to demonstrate its value to Lone Star and audition for future engagements from a repeated M&A and capital markets player.

---

[250] *Presidio*, 251 A.3d at 279 (quoting William W. Bratton & Michael L. Wachter, *Bankers and Chancellors*, 93 Tex. L. Rev. 1, 20–21 (2014)); *see also Rural Metro*, 88 A.3d at 94.

[251] Compl. ¶ 52.

[252] *Id.*

[253] *Id.* ¶ 34.

[254] *Id.* ¶ 75.

RBC's fee arrangement expressly aligned its interests with Lone Star's. RBC's original engagement letter provided for a success fee calculated as a percentage of the consideration that stockholders received. After Lone Star reviewed it, the engagement letter was modified to include in the calculation any consideration Lone Star received under the Tax Agreement. Without that change, RBC's interests would have been aligned with the public stockholders, and RBC would have had a financial incentive to pursue a deal that provided more pro rata consideration.

RBC argues in response that including the Early Termination Payment in the calculation was immaterial because it only generated $448,000 in proceeds. If so, then why did Lone Star revise the engagement letter to include it? At this stage, it is reasonable to infer that Lone Star made the change believing it would affect RBC's behavior. If Lone Star simply wanted RBC to receive more money, Lone Star could have nudged up the percentage. At the pleading stage, those pled facts make it reasonable to infer that the change was material to both Lone Star and RBC.

RBC also tries to defeat the materiality of the payment by observing that Lone Star and RBC did not jump at an early offer in 2018. Accepting that argument would require drawing an inference in favor of the defendants on a fact-laden issue. At the pleading stage, it is not reasonable to infer from that one instance that the Early Termination Payment was immaterial. It is reasonable to infer that Lone Star and RBC had an incentive to maximize the combination of the per-share consideration and the Early Termination Payment. The early offer inferably did not do that. Lone Star and RBC could maximize the combination by keeping the Early Termination

113

Payment high and seeking increased per share consideration. Stockholders, by contrast, only wanted to maximize the per-share consideration.

The plaintiff has not pled that RBC took action that was independently wrongful, but that is not required. "The aider and abettor must knowingly assist another in committing a wrongful act. The means by which an aider and abettor provides assistance need not be independently wrongful."[255] The complaint depicts RBC working hand in glove with Lone Star to engineer a sale transaction that would trigger an Early Termination Payment. During the period when Lone Star explored selling its shares in the Company independent of a whole-company sale, RBC effectively worked as Lone Star's financial advisor, without receiving permission from the Special Committee.[256] And in the final months of the process, as described more fully below, RBC worked closely with the Lone Star-affiliated directors to secure proposals that included a maximum Early Termination Payment.[257]

RBC played an integral part in the effort to sell the Company through a transaction that would trigger the Early Termination Payment. The complaint states a claim against RBC for aiding and abetting that alleged breach.

---

[255] *NEA*, 292 A.3d at 176.

[256] Compl. ¶¶ 77, 86.

[257] *See id.* ¶¶ 100–01, 105–06, 117–18, 122–24, 137.

**B. Evercore**

The complaint next contends that Evercore aided and abetted breaches of fiduciary duty. The plaintiff asserts that Evercore knowingly participated in breaches giving rise to both the Sale Process Claims and the Disclosure Claims.

**1. Aiding And Abetting The Sale Process Claims**

The complaint contends that Evercore aided and abetted breaches of fiduciary duty by the Special Committee. The plaintiff contends that Evercore had a financial incentive to advance Lone Star's interests and that Evercore did so by joining the Special Committee members in doing nothing to check Lone Star's desire for a transaction that included the Early Termination Payment. Largely because of Evercore's compensation arrangement, this theory states a claim on which relief can be granted.

Under its engagement letter, Evercore agreed to "provid[e] advice to the Special Committee on the Company's design and implementation of an appropriate Transaction process, and . . . assist[] the Special Committee's consideration of one or more Transaction proposals received by the Company from third parties and recommend[] the appropriate course of action to the Special Committee."[258] In short, the Special Committee Defendants engaged Evercore to help them protect the Company and its minority stockholders against potential harm that might result from Lone Star's conflict of interest.

---

[258] *Id.* ¶¶ 7, 253; Ex. 28.

Evercore pitched its services to the Special Committee in October 2018 based on its expertise with tax receivable agreements. Evercore specifically warned the Special Committee that Lone Star's "interests may not be fully aligned with the Company's public shareholders" because of the prospect for an Early Termination Payment.[259] In its presentation, Evercore identified one precedent change-in-control transaction in which the parties negotiated away the sponsor's right to an accelerated payout.[260]

But when the Special Committee finally got around to retaining Evercore two years later, Evercore did not act like a financial advisor tasked with helping the Special Committee protect against Lone Star's conflict of interest. Despite identifying an accelerated payout as a source of conflict, Evercore demanded that its contingent fee include a percentage of the Early Termination Payment to Lone Star.[261] That compensation agreement meant that Evercore, the financial advisor brought into the deal to guard against a transaction with an Early Termination Payment, had an incentive to support a transaction that included an Early Termination Payment over remaining independent. Rather than having a financial incentive to act independently, Evercore's engagement letter aligned its interests with Lone Star's and RBC's.

---

[259] *Id.* ¶ 66.

[260] *Id.* ¶ 67.

[261] *Id.* ¶¶ 102, 257.

Evercore tries to defend its fee structure by citing platitudes about contingent fees aligning the financial advisor's interests with those of the seller's stockholders. The situation is actually more complex. "Delaware law recognizes that the business interests of contingently compensated deal advisors who are repeat players in the industry can diverge from the interests of the stockholders as a whole in maximizing the sale price on a particular deal."[262] "Although a contingent compensation arrangement that pays an agent a percentage of deal value generally will align the interests of the agent in getting more compensation with the principal's desire to obtain the best value, the interests of the agent and principal diverge over whether to take the deal in the first place. The agent only gets paid if the deal happens, but for the principal, the best value may be not doing the deal at all."[263] The litigable

---

[262] *Presidio*, 251 A.3d at 278.

[263] *Rural Metro*, 88 A.3d at 94 (footnote omitted); *see In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *43 (Del. Ch. Oct. 16, 2018) ("Deutsche Bank's contingent fee arrangement . . . gave Deutsche Bank a powerful incentive to favor a sale over having PLX remain independent."); *id.* (citing Deutsche Bank's "thick relationship with [the buyer], which included advising [the buyer] contemporaneously on its acquisition of [another company]"); *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *26 (Del. Ch. Oct. 20, 2015) (recognizing that a contingent fee can provide a banker with "a powerful incentive . . . to refrain from providing information to the Board" that could have jeopardized a deal or caused the board to seek a fee reduction); *In re El Paso Gp. S'holder Litig.*, 41 A.3d 432, 442 (Del. Ch. 2012) (discussing how a $35-million-or-nothing contingent fee made "more questionable some of the tactical advice given by Morgan Stanley and some of its valuation advice"); *In re Atheros Commc'ns, Inc.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) (noting that a "contingent fee can readily be seen as providing an extraordinary incentive for [an investment bank] to support the [t]ransaction"); *Forgo v. Health Grades, Inc.*, C.A. No. 5716, at 10 (Del. Ch. Sept. 3, 2010) (TRANSCRIPT) ("[T]he reality is if [the investment bank] can get a deal, they get a deal."); *In re Netsmart Tech. Inc. S'holder Litig.*, 924 A.2d 171, 199 (Del. Ch. 2007) (noting that

dispute in this case concerns whether it constituted a breach of fiduciary duty to sell the Company rather than continue in standalone. As to that issue, Evercore had a conflict.

But even if Evercore were right about the ostensible virtues of contingent fee arrangements, those general platitudes do not validate a fee arrangement that builds in compensation for a divergent interest. Those general platitudes also do not speak to the appropriate compensation arrangement for a special committee. It is one thing to pay contingent compensation to the financial advisor charged with securing the best deal reasonably available. It is another thing to pay contingent compensation to the financial advisor who is supposed to be willing to tell the special committee that the deal should not happen. Because of that different role, a special committee's financial advisor should not receive contingent compensation.[264] A special committee's financial advisor certainly should not receive contingent consideration tied to the conflict that the special committee was created to address, using a compensation arrangement that the special committee and its counsel had flagged as problematic for the financial advisor representing the company.

---

although investment bank would receive 1.7% of any deal, it had "a strong incentive to bring about conditions that would facilitate a deal that would close").

[264] *See In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *10 (Del. Ch. Dec. 21, 2006) ("[T]he contingent compensation of the financial advisor, DLJ, of roughly $40 million creates a serious issue of material fact, as to whether DLJ (and DLJ's legal counsel) could provide independent advice to the Special Committee.").

Like RBC, Evercore claims that the amount of the fee it received for the Early Termination Payment was *de minimis*. So once again, why include it? By putting that fee component in its engagement letter, Evercore spoke more loudly and persuasively than its lawyers do now.

The complaint pleads facts supporting an inference that Evercore acted consistent with the incentives that its engagement letter created. Evercore did not limit itself to preparing a valuation analysis for the Special Committee, as it now claims. To the contrary, during a meeting of the Board on October 31, 2020, Evercore criticized the CD&R, Apollo, and One Rock bids, which contributed to the Board granting exclusivity to American.[265]

The plaintiff also attacks Evercore's presentation to the Special Committee in support of the Merger. Evercore treated the Company's obligations under the Tax Agreement inconsistently by factoring them in for the high-end of the ranges in its valuations, while omitting them from the low-end of the ranges.[266] That approach makes little sense. Either the Tax Agreement imposed contractual obligations, as the defendants now claim, or it did not.

The plaintiff asserts that Evercore manipulated its analysis for two reasons. First, it made American's bid look better relative to the top-end of the ranges. Second, it hid the fact that when the Tax Agreement obligations were included, Evercore's methodologies generated valuations well below the Company's trading price, which

---

[265] Compl. ¶¶ 136–37.

[266] *Id.* ¶¶ 185–88, 196.

could have called into question the reliability of Evercore's work. Conversely, excluding the Early Termination Payment from the high end would have resulted in every valuation metric exceeding the deal price.

Taken as a whole, those allegations state a claim against Evercore for aiding and abetting breaches of fiduciary duty.

### 2. Aiding And Abetting The Disclosure Claims

The complaint also contends that Evercore aided and abetted the breaches of fiduciary duty underlying the Disclosure Claims by authorizing the use of a different analysis in the Information Statement than what Evercore provided to the Special Committee. The complaint fails to articulate a reasonably conceivable claim. The Information Statement accurately described Evercore's analysis. The Information Statement did not use the precise words that the plaintiff wishes it had, but the plaintiff's editorializing is not sufficient to state a claim. Evercore's underlying analysis remains suspect, but the Information Statement described it fairly.

### C. The Buyer Defendants

The complaint also contends that the Buyer Defendants aided and abetted breaches of fiduciary duty. The plaintiff asserts that the Buyer Defendants knowingly participated in breaches giving rise to both the Sale Process Claims and the Disclosure Claims. Neither states a claim on which relief can be granted.

The complaint alleges that the Buyer Defendants aided and abetted the breaches of duty underlying the Sale Process Claims by agreeing to allocate consideration to the Early Termination Payment. The complaint's allegations do not make that inference reasonably conceivable. The only rational inference is that Lone

120

Star and RBC told the Buyer Defendants that Lone Star would not waive its right to the Early Termination Payment. Faced with that demand, the Buyer Defendants structured a transaction that accommodated the Early Termination Payment. It is not reasonably conceivable that the Buyer Defendants believed it was wrongful to allocate consideration to the Early Termination Payment when the Tax Agreement contemplated it.

The complaint alleges that the Buyer Defendants extracted a *quid pro quo* in which they accommodated Lone Star's desire for an Early Termination Payment in exchange for their own desire for a condition based on the number of stockholders who sought appraisal. That is not a reasonable inference. Lone Star had a contractual right to the Early Termination Payment. Lone Star did not need to give anything up to get it.

Turning to the Disclosure Claims, the complaint alleges that American had the right to review and comment on the Information Statement. The complaint also alleges that American helped draft the Information Statement and reviewed its contents. But the plaintiff has not pointed to any disclosures the Buyer Defendants inferably knew were false or misleading. The disclosure problems all concerned internal sell-side activity; there is no reason to believe that the Buyer Defendants had visibility into those issues.

The aiding and abetting claims against the Buyer Defendants are dismissed.

## VII.   THE STATUTORY CLAIMS

Section 262 of the DGCL governs appraisal. The statute imposes requirements that a corporation must meet when it engages in transaction that gives rise to

appraisal rights. Everyone agrees that the Merger triggered appraisal rights for the Company's stockholders. The plaintiff asserts three statutory claims. The first contends that the defendants did not give stockholders sufficient time to seek appraisal.[267] The second asserts that the Appraisal Notice violated Section 262

---

[267] The appraisal statute is remarkably dense and unnecessarily cumbersome. The subsections at issue particularly so. One minor, non-substantive tweak that would improve the statute dramatically would be to include a few more defined terms. Section 262(a) already provides definitions of "stockholder," "stock," and "share." Those definitions might be moved to a new subsection (g) that would include other helpful defined terms. One might define "transaction" as a "merger, consolidation, conversion, transfer, domestication, or continuance for which appraisal rights are provided under this section." Another might define "transacting corporation" as a "constituent, converting, transferring, domesticating or continuing corporation in a transaction."

By my count, the phrase "merger, consolidation, conversion, transfer, domestication, or continuance" appears thirty-six times in the statute. Substituting "transaction" every time that phrase appears would cut 252 words, offset by however many words the definition would add (perhaps twenty?). By my count, the phrase "constituent, converting, transferring, domesticating or continuing corporation" appears twelve times. Substituting "transacting corporation" would cut another eighty-four words, again offset by however many words the definition would add.

To illustrate, the principal clause of Section 262(b) currently states:

Appraisal rights shall be available for the shares of any class or series of stock of a constituent, converting, transferring, domesticating or continuing corporation in a merger, consolidation, conversion, transfer, domestication or continuance to be effected pursuant to § 251 (other than a merger effected pursuant to § 251(g) of this title), § 252, § 254, § 255, § 256, § 257, § 258, § 263, § 264, § 266 or § 390 of this title (other than, in each case and solely with respect to a converted or domesticated corporation, a merger, consolidation, conversion, transfer, domestication or continuance authorized pursuant to and in accordance with the provisions of § 265 or § 388 of this title) . . . .

122

because it did not include all material information that stockholders needed to consider when deciding whether to assert their appraisal rights. The third contends that the Supplement constituted a new appraisal notice but did not allow additional time to seek appraisal. The plaintiff also asserts a claim for breach of fiduciary duty grounded in assertions about intentional interference with stockholders' appraisal rights.

## A.      The Time To Seek Appraisal

The plaintiff contends that the defendants failed to comply with the requirements of Section 262(d)(2) when mailing the Appraisal Notice. This theory states a claim on which relief can be granted.

---

With the help of the preposition "under" and the defined terms "transaction" and "transacting corporation," it would read:

> Appraisal rights shall be available for the shares of any class or series of stock of a transacting corporation in a transaction under § 251 (other than a merger under § 251(g) of this title), § 252, § 254, § 255, § 256, § 257, § 258, § 263, § 264, § 266 or § 390 of this title (other than, in each case and solely with respect to a converted or domesticated corporation, a transaction under § 265 or § 388 of this title) . . . .

A subsection currently containing 117 words would become a subsection containing 85, for a reduction of 27%. It would be self-evidently easier to read.

Another easy simplification would be to define the term "stock" and "shares" to include depositary receipts. That would enable the statute to eliminate the nine times where the statute references shares "or depository receipts," cutting another twenty-seven words.

These are simple improvements that would make everyone's lives easier. For other helpful ideas, *see* Holger Spamann, *Simplified Codes* (last updated 2021), https://simplifiedcodes.com.

Section 262(d)(2) governs the perfection of appraisal rights when the triggering transaction receives stockholder approval other than at a meeting of stockholders. After stating that at least one of the entities that is a party to the transaction giving rise to appraisal rights must send out an appraisal notice, Section 262(d)(2) specifies how much time a stockholder has to demand appraisal:

> Any stockholder entitled to appraisal rights may, within 20 days after the date of giving such notice or, in the case of a merger approved pursuant to § 251(h) of this title, within the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days after the date of giving such notice, demand in writing from the surviving, resulting or converted entity the appraisal of such holder's shares; provided that a demand may be delivered to such entity by electronic transmission if directed to an information processing system (if any) expressly designated for that purpose in such notice.

Lurking within this labyrinthine prose is a requirement that stockholders have twenty days after the giving of notice to submit their appraisal demands.

The Delaware Supreme Court insists that corporations and stockholders comply strictly with the appraisal statute.[268]

> [F]airness requires that the corporation be held to the same strict standard of compliance with the appraisal statute as the minority shareholders. Our case law is replete with examples where dissenting minority shareholders that failed to comply strictly with certain technical requirements of the appraisal statute, were held to have lost their entitlement to an appraisal, and, consequently, lost the

---

[268] *GGP*, 282 A.3d at 56 (admonishing that "stockholders must strictly comply with the requirements of Section 262" and that "Section 262 also places strict compliance requirements on corporations"); *Alabama By-Prod. Corp. v. Cede & Co.*, 657 A.2d 254, 261 (Del. 1995) (holding that a stockholder may not alter a decision to pursue appraisal "without strict compliance with the appraisal statute"); *see also A.L. Garber Co., Inc. v. Lutz*, 340 A.2d 188, 189 (Del. 1975) (citing "general policy consideration dictating strict adherence to statutory time periods in appraisal proceeding").

opportunity to recover the difference between the fair value of their shares and the merger price. These technical statutory violations were not curable, so that irrespective of the equities the unsuccessful appraisal claimant could not proceed anew. That result effectively allowed the corporation to retain the entire difference between fair value and the merger price attributable to the shares for which appraisal rights were lost. The appraisal statute should be construed even-handedly, not as a one-way street.[269]

By requiring strict compliance, Delaware law "ensures the expedient and certain appraisal of stock."[270] The statute includes bright line requirements, but "it does so for the benefit of all parties to the appraisal proceeding."[271]

The requirement of strict compliance extends to Section 262(d)(2): "Within certain time periods outlined in the statute, corporations must notify stockholders of record of their right to seek appraisal and attach a copy of Section 262 to that notice."[272] The time period is a statutory mandate. It is not optional.

In this case, Lone Star approved the Merger by written consent. Section 262(d)(2) therefore gave the Company the option to send the Appraisal Notice "before

---

[269] *Berger v. Pubco Corp.*, 976 A.2d 132, 144 (Del. 2009) (footnote omitted); *see Alabama By-Prods.*, 657 A.2d at 263 ("Under the Delaware appraisal scheme, the rights of the corporation vis-a-vis the appraisal petitioners are reciprocal. A shareholder's right to appraisal vests at the time of perfection, and that right may cease only upon strict compliance with one of the conditions set forth in Section 262(k).").

[270] *Alabama By-Prods.*, 657 A.2d at 263.

[271] *Id.*

[272] *GGP*, 282 A.3d at 57.

the effective date of the merger."[273] The Company chose that option. Under Section 262(d)(2), any stockholder who wanted to exercise appraisal rights was entitled to demand an appraisal in writing "within 20 days after the date of giving such notice." The formal Appraisal Notice was dated December 4, 2020. Both the Notice and the Information Statement distributed with it stated that they were "first being mailed to stockholders on or about December 4, 2020."[274] Both the Notice and the Information Statement stated that the twenty-day deadline for demanding appraisal was December 24, 2020.[275]

Zeroing in on the phrase "on or about," the plaintiff argues that the Appraisal Notice may have been mailed to some stockholders after December 4. The plaintiff contends that it is reasonably conceivable that the Company violated Section 262(d)(2), because any stockholders to whom notice was mailed after December 4 did not receive the statutorily mandated twenty-day time period within which to demand appraisal.

That is a reasonable inference, meaning that the complaint's allegations state a claim on which relief can be granted. The phrase "on or about" means that the person making the statement isn't sure exactly when an event happened. It might have been "on" that date. Or it might have been a little before or a little after, i.e.,

[273] 8 *Del. C.* § 262(d)(2).

[274] Compl. ¶ 169–70; IS at 3, 67.

[275] IS at 3, 67.

"about" that date. Notably, the disclosure does not say "on or before." Instead, the disclosure states that the notice was being "first mailed" to stockholders "on or about December 4, 2020." It is therefore reasonable to infer that a statutory violation could have occurred.

To defeat that inference, the Company could have relied on Subsection 262(d)(2). It provides that "[a]n affidavit of the secretary or assistant secretary or of the transfer agent of the corporation or entity that is required to give either notice that such notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein."[276] By statute, the affidavit would have been sufficient to clarify the ambiguous language in the Information Statement. A plaintiff could plead facts to overcome the prima facie evidence supplied by a Section 262(d)(2) affidavit, but it would require more than pointing to an ambiguous phrase like "on or about." The Company chose not to supply an affidavit, leaving itself open to the plaintiff-friendly inference.

To argue for dismissal, the Company relies heavily on the Court of Chancery decision in *Skeen*,[277] where the corporation's information statement said that it was mailed "on or about April 1, 1998." A meeting of stockholders was scheduled for April 21, 1998, and the plaintiffs in *Skeen* made the same argument: The use of "on or about" supported an inference that "not all of the notifications were mailed by April

---

[276] 8 *Del. C.* 262(d)(2).

[277] *Skeen v. Jo-Ann Stores, Inc.*, 1999 WL 803974 (Del. Ch. Sept. 27, 1999), *aff'd* 750 A.2d 1170 (Del. 2000).

1, 1998."[278] But the court refused to grant the inference, reasoning that that "[t]he use of the phrase 'on or about April 1, 1998' may be inelegant, but that alone does not fairly permit an inference that the mailing of the Information Statements had not been completed by April 1, 1998."[279]

The *Skeen* decision failed to give the plaintiff the benefit of a reasonable inference at the pleading stage. The opinion drew a defense-friendly inference that "on or about" meant "on." That is contrary to how Rule 12(b)(6) operates. The *Skeen* decision also failed to apply the twenty-day notice even-handedly by enforcing it strictly against both corporations and stockholders. The Delaware Supreme Court's decisions require that stockholders strictly comply with the twenty-day window. The Delaware Supreme Court's decisions also require that corporations strictly comply with their notice obligations under the statute. Doubtless the *Skeen* court was worried about imposing a burden on the defendant corporation unnecessarily, but the Section 262(d)(2) affidavit provides a statutory method by which a corporation can provide prima facie evidence that notice was sent properly. Particularly when a corporation does not take that easy route, a plaintiff is entitled to have ambiguous language interpreted in its favor at the pleading stage.

It is reasonable to infer that the Appraisal Notice was not mailed to every stockholder on December 4, 2020, particularly when the company was trying to

---

[278] *Id.* at 4.

[279] *Id.*

complete the mailing during a pandemic and in the midst of the holiday rush.[280] The proper course is to give the plaintiff the benefit of the inference.

It should not be hard for the Company to determine when the mailing took place. If it was handled properly, the Company should be able to move for summary judgment. At this point, the plaintiff's allegations state a claim for a violation of Section 262(d)(2) based on the date of mailing.

## B.    The Contents Of The Appraisal Notice

The plaintiff next contends that the Appraisal Notice violated Section 262 because it did not include all material information that stockholders needed to consider when deciding whether to assert their appraisal rights. That claim fails.

In particularly recondite language, Section 262(d)(2) identifies the information that an appraisal notice must contain. The notice

> shall notify each stockholder of any class or series of stock of such constituent, converting, transferring, domesticating or continuing corporation who is entitled to appraisal rights of the approval of the merger, consolidation, conversion, transfer, domestication or continuance and that appraisal rights are available for any or all shares of such class or series of stock of such constituent, converting, transferring, domesticating or continuing corporation, and shall include in such notice either a copy of this section (and, if 1 of the constituent corporations or the converting, transferring, domesticating or continuing corporation is a nonstock corporation, a copy of § 114 of this title) or information directing the stockholders to a publicly available electronic resource at which this section (and § 114 of this title, if applicable) may be accessed without subscription or cost. Such notice may, and, if given on or after the effective date of the merger, consolidation, conversion, transfer, domestication or continuance, shall,

---

[280] Compl. ¶¶ 7, 167.

129

also notify such stockholders of the effective date of the merger, consolidation, conversion, transfer, domestication or continuance.[281]

Boiled down, the notice must inform the stockholders entitled to appraisal of "the approval" of a transaction triggering their appraisal rights. The notice also must include or provide access to a copy of the appraisal statue. That's it.

Later, in a perplexingly convoluted passage, Section 262(d)(2) explains that if the notice that the corporation sent did not identify the effective date of the transaction, then a second notice has to go out that provides that information:

> If such notice did not notify stockholders of the effective date of the merger, consolidation, conversion, transfer, domestication or continuance, either (i) each such constituent corporation or the converting, transferring, domesticating or continuing corporation shall send a second notice before the effective date of the merger, consolidation, conversion, transfer, domestication or continuance notifying each of the holders of any class or series of stock of such constituent, converting, transferring, domesticating or continuing corporation that are entitled to appraisal rights of the effective date of the merger, consolidation, conversion, transfer, domestication or continuance or (ii) the surviving, resulting or converted entity shall send such a second notice to all such holders on or within 10 days after such effective date; provided, however, that if such second notice is sent more than 20 days following the sending of the first notice or, in the case of a merger approved pursuant to § 251(h) of this title, later than the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days following the sending of the first notice, such second notice need only be sent to each stockholder who is entitled to appraisal rights and who has demanded appraisal of such holder's shares in accordance

---

[281] There are four times when Section 262 references the need to supplement a notice with a copy of Section 114 if the transacting corporation is a non-stock corporation. That could be said once, in a separate subsection that stated: "If one of the transacting corporations is a non-stock corporation, then whenever the statute refers to a notice sending or providing access to a copy of this section, the notice must also refer to or provide access to a copy of § 114." The word count reduction would be minimal, but readability would improve.

with this subsection and any beneficial owner who has demanded appraisal under paragraph (d)(3) of this section.

Notably, a corporation can choose to give the second notice containing the effective date only to stockholders who already demanded appraisal. That implies that the effective date of the transaction giving rise to appraisal rights is not statutorily required information that stockholders must have before seeking appraisal.

The complaint does not assert that the Appraisal Notice failed to inform stockholders that the Merger had been approved or failed to include or provide access to a copy of the appraisal statute. The Appraisal Notice therefore contained the two statutorily required items.

The complaint instead contends that the Appraisal Notice was insufficient because it failed to provide stockholders with all material information relating to the decision to assert appraisal rights. As a statutory claim, that theory fails. The statutorily required appraisal notice serves "mainly to notify the stockholders of the merger and of their appraisal remedy" and must "apprise the stockholders of their right to an appraisal, the effective date of the merger, and . . . provide a copy of [or access to] section 262."[282] Nothing in the appraisal statute requires that stockholders receive all information material to the decision to exercise appraisal rights. The plaintiff has asserted litigable disclosure claims, but they are claims for breach of the fiduciary duty of disclosure, not claims under the appraisal statute.

---

[282] *Gilliland v. Motorola, Inc.*, 859 A.2d 80, 86 (Del. Ch. Oct. 8, 2004).

131

## C.     The Supplement As A New Notice

Third, the plaintiff contends that the Supplement constituted a new Appraisal Notice that triggered a new twenty-day notice period. As a statutory violation, that claim fails as well.

The Company filed the Supplement three days before appraisal demands were due. That filing consisted of four pages of disclosures, including nine separate items that replaced or added paragraphs spanning multiple pages of the Information Statement. The Company did not send the Supplement to stockholders or extend the time period for making appraisal demands. This decision has already addressed the plaintiff's claim that the Supplement contained additional information that stockholders did not have sufficient time to consider. As a statutory matter, the plaintiff contends that the Supplement also constituted a new notice and triggered a new twenty-day period.

Nothing in the appraisal statute requires that stockholders receive the information in the Supplement. As a statutory matter, the filing of the Supplement did not constitute a new appraisal notice, nor an amendment or supplement to the earlier Appraisal Notice. It did not trigger a new statutory period for appraisal demands. The statutory claim based on the Supplement is therefore dismissed.

## D.     The Proper Statutory Defendants

The plaintiff purports to assert its statutory claims against the Lone Star Defendants, the Special Committee Defendants, and the Buyer Defendants. The only proper defendants are the Company as the surviving corporation and Holdings as a constituent corporation.

132

Section 262(d)(2) states that when there is no meeting of stockholders to approve a transaction giving rise to appraisal rights, then,

> either a constituent, converting, transferring, domesticating or continuing corporation before the effective date of the merger, consolidation, conversion, transfer, domestication or continuance, or the surviving, resulting or converted entity within 10 days after such effective date, shall notify each stockholder of any class or series of stock of such constituent, converting, transferring, domesticating or continuing corporation who is entitled to appraisal rights of the approval of the merger, consolidation, conversion, transfer, domestication or continuance and that appraisal rights are available for any or all shares of such class or series of stock of such constituent, converting, transferring, domesticating or continuing corporation . . . .

Put simply, one of the parties to the transaction giving rise to appraisal must send the appraisal notice.

For present purposes, that means the Company, Holdings, and Merger Sub are proper defendants for the statutory claim, with the qualification that the separate corporate existence of Merger Sub ceased when it merged with and into the Company. By operation of law, any liabilities that Merger Sub could have faced for the notice passed to the Company as the surviving corporation.[283] The Company is thus a trebly proper defendant for purposes of the statutory violation, once as a constituent corporation, once as the surviving corporation, and once as the successor-by-merger to Merger Sub.

The plaintiff also contends that the Company's directors are proper defendants because under Section 141(a) of the DGCL, they are charged with managing the

---

[283] *See* 8 *Del. C.* § 259.

business and affairs of the Company.[284] After observing that a corporation can only act through human agents, the plaintiff asserts that the directors bore the statutory obligation to comply with the notice requirement of Section 262(d)(2).

Although the plaintiff is correct that a corporation can only act through human agents, the plaintiff is wrong that the directors can be made directly responsible for a statutory violation. As a corporation, the Company is a juridical person—a "body corporate" with a separate legal existence.[285] The Company's obligations are, in the first instance, its own obligations. The Company, not is directors, is the proper defendant for a claim under Section 262(d)(2).

## E.  The Appraisal Interference Claim

The plaintiff's effort to name the directors as defendants for a claimed violation of Section 262(d)(2) segues into the appraisal interference claim. That theory asserts that the directors breached their fiduciary duties by taking steps to interfere with the stockholders' potential exercise of their appraisal rights.

---

[284] *See Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *5 (Del. Ch. Aug. 16, 2010); *In re Aerojet Rocketdyne Hldgs., Inc.*, 2022 WL 2180240, at *10 (Del. Ch. June 16, 2022).

[285] *See* 8 *Del. C.* § 106 ("Upon the filing with the Secretary of State of the certificate of incorporation, executed and acknowledged in accordance with § 103 of this title, the incorporator or incorporators who signed the certificate, and such incorporator's or incorporators' successors and assigns, shall, from the date of such filing, be and constitute a body corporate, by the name set forth in the certificate, subject to § 103(d) of this title and subject to dissolution or other termination of its existence as provided in this chapter.").

A claim that directors breached their fiduciary duties by failing to comply with the appraisal statute might seem novel, but it is nothing more than a *Massey* claim. "Delaware law does not charter law breakers."[286] The DGCL only permits a corporation to pursue "lawful business" by engaging in "lawful acts."[287] When directors "knowingly cause or permit a Delaware corporation to violate positive law, they have acted in bad faith, and are liable to the corporation for resulting damages."[288]

This court regularly addresses *Massey* claims which assert that directors knowingly violated a statutory or regulatory regime. Just as directors could be personally liable for knowingly causing the corporation to violate mine safety

---

[286] *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011); *accord Desimone v. Barrows*, 924 A.2d 908, 934–35 (Del. Ch. 2007) ("Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully. The knowing use of illegal means to pursue profit for the corporation is director misconduct.") (cleaned up); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity.").

[287] *See* 8 *Del. C.* § 101(b) ("A corporation may be incorporated or organized under this chapter to conduct or promote any lawful business or purposes, except as may otherwise be provided by the Constitution or other law of this State."); 8 *Del. C.* § 102(a)(3) ("It shall be sufficient to state [in a corporation's certificate of incorporation], either alone or with other businesses or purposes, that the purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware, and by such statement all lawful acts and activities shall be within the purposes of the corporation . . . .").

[288] *Kandell v. Niv*, 2017 WL 4334149, at *2 (Del. Ch. Sept. 29, 2017).

regulations,[289] directors could be personally liable for knowingly causing the corporation to violate a section of the DGCL. The source of the statutory mandate is different, but the operative legal framework is the same.

That said, a stockholder plaintiff cannot assert a *Massey* claim preemptively, whenever a plaintiff believes that a corporation is violating the law and that its directors may be knowingly causing the violation. Like its sibling theory, the *Caremark* claim,[290] a *Massey* claim for breach of fiduciary duty operates conceptually as a claim for indemnification.[291] Framed generally, indemnification shifts the burden of a loss from the party that suffered it to the party that should bear it,[292] whether

---

[289] *Massey*, 2011 WL 2176479, at *20.

[290] A *Caremark* claim is the colloquial term for a claim asserting a breach of the duty of oversight, in a tip of the judicial hat to Chancellor Allen's landmark decision. See *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996). Oversight claims generally fall into two categories: prong-one claims, also known as Information-Systems Claims, and prong-two claims, also known as Red Flags Claims. *See generally In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 674 (Del. Ch. 2023).

[291] *South v. Baker*, 62 A.3d 1, 25 (Del. Ch. 2012) (noting that the derivative claims' *Caremark* claim functioned as "a tag-along indemnification action grounded primarily on still-developing harms from the Lucky Friday closure and the far-from-resolved federal securities actions"); *see also Brenner v. Albrecht*, 2012 WL 252286, at *7 (Del. Ch. Jan. 27, 2012) (staying derivative action that sought to hold directors liable for knowingly violating the federal securities laws and thereby indemnify company for harm to be suffered from federal class action); *Brudno v. Wise*, 2003 WL 1874750, at *5 (Del. Ch. Apr. 1, 2003) (noting that "the overwhelming thrust of the Delaware Action complaint [for breach of fiduciary duty] is a demand for indemnification largely for harm to be incurred by [the corporation] in the Federal Securities Action").

[292] *E.g.*, *In re Am. Int'l Gp., Inc.*, 965 A.2d 763 (Del. Ch. 2009) ("Indemnification . . . places the entire burden of a loss upon the party ultimately liable or responsible

136

through insurance,[293] by contract,[294] by statute,[295] or under a common law doctrine.[296] Conceptually, a *Massey* claim shifts a loss from an injured party (the corporation) to another party that should bear it (the allegedly faithless fiduciaries that knowingly caused the corporation to violate the law).[297]

An indemnification claim does not ripen until a loss triggering the indemnification obligation has been established. Thus, where one corporation had agreed to indemnify stockholders for the loss they suffered from the breach of an earn-out provision, the Delaware Supreme Court held that the claim for indemnification

---

for it, and by whom the loss should have been discharged initially." (quoting *Levy v. HLI Operating Co., Inc.*, 924 A.2d 210, 221 (Del. Ch. 2007), *aff'd sub nom. Tchr. Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011)).

[293] Cathleen M. Devlin, *Indemnity and Exculpation: Circle of Confusion in the Courts*, 33 Emory L.J. 135, 143–44 (1984) ("Generally, insurance is a form of indemnification that provides security against loss by the insured.").

[294] *See, e.g.*, *Acq., Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *8 (Del. Ch. May 3, 2017) (noting that parties to a transaction agreement "can shift risks of loss in their indemnification schemes as is appropriate and necessary to get the deal done").

[295] *See, e.g.*, 8 *Del. C.* § 145(a)-(c).

[296] *See Quereguan v. New Castle Cty.*, 2006 WL 2522214, at *5 (Del. Ch. Aug. 18, 2006) (distinguishing between contractual indemnification and "'common law indemnification,' which is defined as a general right of reimbursement for debts owed to third parties by the [indemnitor] as a secondarily liable party . . . .").

[297] *See McDonald's*, 289 A.3d at 382 (explaining that a derivative claim asserting a bad faith breach of duty based on sexual harassment would seek to "shift the loss that the entity suffered to the human actor who caused it").

did not ripen until the trial court determined that the earn-out provision had been breached.[298]

Similar timing principles govern *Massey* and *Caremark* claims. Before a plaintiff can invoke those theories, the plaintiff must point to some sufficiently concrete corporate injury. Typically, that will require a prior adjudication that the statute or regulation was violated, the payment of a fine or penalty, or a settlement.

The existence of a predicate injury serves an important policy function by limiting the ability of plaintiffs to use *Massey* and *Caremark* claims as vehicles to litigate alleged violations of far-flung statutory and regulatory regimes. Without that type of gating requirement, a stockholder plaintiff could assert that directors had knowingly violated a statutory or regulatory scheme in another state or country, plead facts supporting a statutory violation, and then litigate that claim in the Court of Chancery. Take a recent example: A stockholder plaintiff alleged that a corporation had violated the Sherman Act, attempted to plead facts supporting the Sherman Act violations, alleged that the directors knowingly caused the corporation to commit the alleged Sherman Act violations, and sought to litigate the existence of the alleged Sherman Act violations in this court.[299] The Delaware Court of Chancery has neither

---

[298] *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 195 (Del. 2009); *see Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *53 (Del. Ch. July 12, 2010) ("[I]ndemnification claims do not typically ripen until after the merits of an action have been decided, and all appeals have been resolved.").

[299] *See Southeastern Pa. Trans. Auth. v. Zuckerberg*, C.A. No. 2021-0218 (Del. Ch. Mar. 1, 2023) (TRANSCRIPT).

the expertise nor the resources to adjudicate claims under statutes and regulations from across the country or around the world.

By contrast, once there has been sufficient evidence of a concrete injury, a *Caremark* or *Massey* claim becomes viable. Using the example of the alleged Sherman Act violations, if a federal court determined that the corporation violated the Sherman Act, then a stockholder plaintiff could assert a derivative claim to shift the loss to the allegedly faithless fiduciaries who caused the corporation harm, as long as the plaintiff could plead facts supporting an inference that the directors knowingly caused the corporation to commit the violations and could overcome the pleading burdens imposed by Rule 23.1. At that point, this court would not be put in the position of adjudicating whether a violation of the Sherman Act occurred. The court would be adjudicating whether, under Delaware law, there had been a fiduciary breach.

Applied to this case, the foregoing principle means that the plaintiffs cannot presently bring a claim against the directors for knowingly violating the appraisal statute. If the plaintiffs prove a violation of the appraisal statute, and if the corporation suffers harm as a result, then a derivative claim for breach of fiduciary duty would become theoretically viable. The stockholder plaintiff would still need to plead that the directors violated the appraisal statute knowingly, and they also would have to be able to overcome Rule 23.1, but the claim would be ripe.

At present, that claim is not yet ripe. The plaintiff has only pled a straightforward failure to comply with a statutory notice requirement. That claim

lies against the juridical actors who were responsible for compliance. The plaintiff has not pointed to a corporate injury that might support a *Massey* claim designed to shift the loss to faithless directors. The appraisal interference claim is therefore dismissed.

## VIII. CONCLUSION

For the reasons stated above, the defendants' motion to dismiss is granted in part and denied in part. The complaint fails to state a claim for breach of fiduciary duty against Lone Star or the Lone Star directors for allegedly diverting merger consideration from the unaffiliated stockholders through the Early Termination Payment. The complaint also fails to state a claim for aiding and abetting breaches of fiduciary duty against the Buyer. To the extent the defendants sought dismissal of those claims, the motions to dismiss are granted. Otherwise, the motions to dismiss are denied.